STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Anthony T. HICKS, Defendant-Appellant.

Supreme Court

*No. 94–2256–CR. Oral argument May 31, 1996.—Decided June 25, 1996.*

(Also reported in 549 N.W.2d 435.)

For the petitioner-respondent-petitioner the cause was argued by *James M. Freimuth*, assistant attorney general, with whom on the briefs was *James E. Doyle*, attorney general.

For the defendant-appellant there was a brief by *Stephen P. Hurley, John D. Hyland* and *Hurley, Burish & Milliken, S.C.*, Madison and oral argument by *Stephen P. Hurley*.

WILLIAM A. BABLITCH, J. The State of Wisconsin (State) seeks review of a published decision of the court of appeals which reversed a judgment of conviction and remanded the matter for a new trial. Anthony Hicks (Hicks) was convicted of one count of burglary, one count of robbery, and two counts of second degree sexual assault. The court of appeals concluded that Hicks received ineffective assistance of trial counsel because defense counsel failed to have pubic hair specimens found at the crime scene subjected to DNA analysis.

We affirm the court of appeals but on different grounds. We perceive the issue as whether Hicks should be granted a new trial in the interest of justice because the real controversy of identification was not fully tried. *See* Wis. Stat. § 751.06.[1] Our examination of

___

[1] All future statutory references will be to the 1993-94 volume unless otherwise indicated. Wisconsin Stat. § 751.06 provides as follows:

> **Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgement or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of proper judgment or remit the case to the trial court for the entry of the proper judgment or for

the record leads us to conclude that the real controversy was not fully tried inasmuch as: (1) the DNA evidence excluding Hicks as the donor of one of the hair specimens was relevant to the critical issue of identification; (2) the jury did not hear this evidence; and (3) instead, the State used the hair evidence assertively and repetitively as affirmative proof of Hicks' guilt. We cannot say with any degree of certainty that the hair evidence used by the State during trial played little or no part in the jury's verdict. We therefore must conclude the real controversy of identification was not fully tried. Accordingly, we remand the case for a new trial in the interests of justice.

The relevant facts, as summarized by the court of appeals, 195 Wis. 2d 620, 623-27 (1995), are as follows. The convictions are the result of charges that on the morning of November 15, 1990, Hicks gained entry into the apartment of D.F., a Caucasian female, with intent to commit a felony, and that once inside the apartment he forced her into two separate acts of sexual intercourse and robbed her of $10.

At trial, D.F. testified that she heard a knock on her apartment door, looked through the peephole for approximately 10 seconds, and saw a black man who told her that he was her upstairs neighbor. The man asked to use her telephone because his was broken. D.F. let the man into her apartment and led him to the phone, all the while facing him. While she was in the bathroom getting ready for work, she saw the man's face behind her in the mirror. He threw a scarf around her head and neck, blinding her with both the scarf and

a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

her hair. During the assault that followed, she caught glimpses of his face and he spoke to her intermittently. According to D.F., the assailant was in her apartment between 7:25 a.m. and 7:55 a.m. D.F. picked out Hicks as her assailant from an eight-man line-up two days after the assault.

It was stipulated that Hicks was living in the same apartment complex as D.F., and that the two apartments were 90 seconds away by walking.

The State presented testimony from a State Crime Lab analyst that, based on a microscopic examination, a Negro head hair found on the comforter of D.F.'s bed and four Negro pubic hairs found when the police conducted a vacuum sweeping of the apartment approximately 15 days after the assault were "consistent" with the samples provided by Hicks. The analyst, Karen Doerfer, also testified that a Caucasian head hair was found inside the pants Hicks was wearing when he was taken into custody 48 hours after the assault. These pants were not the sweat pants D.F. testified were worn by her assailant. The Caucasian head hair was found when the pants were examined a few weeks later. Doerfer testified that, based on a microscopic examination, the Caucasian head hair was "consistent" with a sample provided by D.F.

Doerfer explained that all Negro hair shares the same characteristics, and all Caucasian hair shares the same characteristics, although not all Negro hair is identical and not all Caucasian hair is identical. She also testified that a microscopic comparison of hair, unlike fingerprints, can never yield a definitive identification. She stated that to a reasonable degree of scientific certainty, the unknown Negro and Caucasian hair specimens "could have" come from Hicks and D.F.

respectively. Other than the microscopic comparisons, the State performed no other tests on the hair samples.

The State performed serological testing on specimens of semen, blood and saliva obtained at the crime scene. These results were inconclusive. Pursuant to the motion of Hicks' trial counsel, the semen was sent to a laboratory outside the state for DNA analysis. These results were inconclusive due to insufficient sample size.

D.F. testified that no black male had ever been in her apartment before the assault and that only once, almost two years before the assault, was a black female in her apartment. This woman wanted to borrow a blanket.

A defense witness, Savannah Williams, testified that she was living with Hicks at the time of the assault. On that morning, Hicks left their apartment at about 6:40 a.m. to meet his ride for work. He had been complaining that he was not feeling well. According to Williams, Hicks returned after about 20 minutes saying he was not going to work that morning. She was with him, she testified, until about 7:00 a.m., when she left for Rockford, Illinois. She identified a call on the telephone bill made to her mother's house in Rockford at 8:12 a.m., which she said was made by Hicks, reaching her just after she arrived at her mother's.

Hicks' employer testified that Hicks called his place of employment sometime between 7:00 a.m. and 7:30 a.m. that morning to say he would not be in.

After Hicks' conviction and sentencing, Hicks had a DNA analysis performed at Cellmark Diagnostics in Germantown, Maryland, on the hair specimens. He then moved for a new trial contending, among other claims, that his trial counsel had been ineffective in not having DNA testing done on the hair specimens. Hicks

asserted that the DNA test result was evidence which, under the circumstances of this case, required a new trial. Hicks also moved for a new trial in the interests of justice. This motion was based, in part, upon the specific theory that the controversy had not been fully tried because the jury had not received the newly-discovered DNA evidence.

At the evidentiary hearing on the motion, Dr. Charlotte Word of Cellmark testified that the unknown Caucasian head hair, the unknown Negro head hair,. and two of the unknown Negro pubic hair specimens did not yield DNA sufficient for analysis. Specimens 012 and 013 were the two pubic hair specimens for which enough DNA was obtained. Word testified that specimen 012 revealed the presence of DNA from two sources. This usually indicates, Word said, the presence of a second source of DNA on the hair itself, such as blood, semen or saliva. Because of the two sources of DNA, the results as to this specimen were inconclusive. Hicks was excluded as the source of the main amount of DNA on specimen 012, but Word could not come to a conclusion as to the fainter source of DNA on specimen 012.

As for specimen 013, the DNA from this sample was compared to the DNA extracted from Hicks' blood sample. Word testified that Hicks was excluded as the source of the DNA from this specimen. Word testified that, in her opinion to a reasonable degree of scientific certainty, Hicks was not the donor of hair specimen 013. Word acknowledged that this opinion was based on the assumption that the DNA on specimen 013 was from a single source. Word could not prove the DNA was from a single source, but she stated that was the most reasonable conclusion based on several factors. In

156

addition, there was no information to suggest it was not from a single source.

The circuit court, the Honorable Robert R. Pekowsky, denied Hicks' motion for a new trial. The court concluded that there was no prejudice to Hicks as a result of his counsel's failure to obtain DNA test results for trial because it was not reasonably probable that a new trial with the DNA testimony would result in a different verdict. Hicks appealed.

The court of appeals reversed the judgment of conviction and ordered a new trial. The court determined that Hicks had received ineffective assistance of counsel under the Sixth Amendment because defense counsel failed to pursue pretrial DNA testing of the pubic hair specimens collected from D.F.'s apartment. The court reasoned that there was a "probability sufficient to undermine confidence in the outcome that, but for counsel's failure to subject the hair specimens to DNA analysis, the result of the trial would have been different." *State v. Hicks*, 195 Wis. 2d 620, 632, 536 N.W.2d 487 (Ct. App. 1995). The State seeks review of the court of appeals' decision.

The State contends that Hicks was not prejudiced by the failure of counsel to obtain these DNA test results and present them to the jury because the results would not have affected the outcome of the trial. According to the State, the court of appeals' decision creates a conundrum for defense counsel whenever counsel is faced with biological evidence recovered by the State that has not been submitted for DNA analysis.

Although the parties' briefs and oral arguments before this court framed the issue in various ways,[2] the

---

[2] The State presents the issue as follows:

parties' arguments revolve largely around the fact that the jury did not hear the DNA evidence.

We frame the issue as follows: whether Hicks should be granted a new trial in the interest of justice because the real controversy of identification was not fully tried. *See* Wis. Stat. § 751.06. Our examination of the record leads us to conclude that the real controversy was not fully tried inasmuch as: (1) the DNA evidence excluding Hicks as the donor of one of the hair specimens was relevant to the critical issue of identification; (2) the jury did not hear this evidence; and (3) instead, the State used the hair evidence assertively and repetitively as affirmative proof of Hicks' guilt. We cannot say with any degree of certainty that the hair evidence used by the State during trial played little or

---

(1) Did the Defendant receive constitutionally effective assistance of trial counsel when counsel chose not to pursue pretrial DNA analysis of hair specimens collected by the State?

Hicks presents four issues as follows:

(1) Where the evidence showed that all the pubic hairs found at the crime scene belonged to. the assailant; and where subsequent DNA testing excluded Hicks as the source of one hair, whether the circuit court erred in denying a new trial.

(2) Whether trial counsel's performance was deficient under *Strickland v. Washington*, 466 U.S. 668 (1984), where counsel failed to consult with the defendant regarding pretrial DNA testing, and where such testing would not conflict with counsel's trial strategy; and in counsel's failure in dealing with an absent material witness.

(3) Whether the circuit court erred in denying Hicks' pretrial motion for the production of the complaining witness and another witness' palm prints because fundamental fairness guaranteed to Hicks by due process required that the court afford Hicks an opportunity to obtain evidence, otherwise unavailable to him, to support his defense.

(4) Whether the circuit court erred in refusing to give the alibi jury instruction as requested by Hicks when the evidence and reasonable inferences supported giving the instruction.

no part in the jury's verdict. Accordingly, we remand the case for a new trial in the interests of justice.[3]

██

This court has both inherent power and express statutory authority to reverse a judgment of conviction and remit a case for a new trial in the interest of justice, even where the circuit court has exercised its power to order or to deny a new trial. *State v. Penigar*, 139 Wis. 2d 569, 408 N.W.2d 28 (1987); *see also State v. McConnohie*, 113 Wis. 2d 362, 369-71, 334 N.W.2d 903 (1983). Wisconsin Stat. § 751.06 provides as follows:

> **Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

██

Thus, a new trial may be ordered in either of two ways: (1) whenever the real controversy has not been

---

[3] Hicks raises the additional issues of: (1) whether the circuit court erred in denying Hicks' pretrial motion for the production of palm prints; and (2) whether the circuit court erred in refusing to give the alibi jury instruction as requested by Hicks. Because we remand the case to the circuit court for a new trial, we leave the resolution of these issues to the circuit court.

159

fully tried; or (2) whenever it is probable that justice has for any reason miscarried. Separate criteria exists for determining each of these two distinct situations. *State v. Wyss*, 124 Wis. 2d 681, 735, 370 N.W.2d 745 (1985).

 This court may exercise its power of discretionary reversal under the first part of Wis. Stat. § 751.06, without finding the probability of a different result on retrial when it concludes that the real controversy has not been fully tried. *See, e.g., State v. Cuyler*, 110 Wis. 2d 133, 142-43, 327 N.W.2d 662 (1983); *Garcia v. State*, 73 Wis. 2d 651, 245 N.W.2d 654 (1976); *Lorenz v. Wolff*, 45 Wis. 2d 407, 173 N.W.2d 129 (1970); *Logan v. State*, 43 Wis. 2d 128, 137, 168 N.W.2d 171 (1969). The case law reveals that situations in which the controversy may not have been fully tried have arisen in two factually distinct ways: (1) when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case; and (2) when the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried. *Wyss*, 124 Wis. 2d at 735. In *Wyss*, we explained that:

> In either of these situations, the court is not confined to apply the mechanistic formula articulated in *Lock v. State*, 31 Wis. 2d 110, 142 N.W.2d 183 (1966), which required it to find a substantial probability of a different result on retrial. . . . Thus, the court must have the liberty in such situations to consider the totality of circumstances and determine whether a new trial is required to accomplish the ends of justice because the real controversy has not been fully tried.

160

*Id.* at 735-36 (citations omitted).

■

A reading of the decisions of this court reveals a reluctance to grant a new trial in the interest of justice upon our own motion, and we have done so only in exceptional cases. *Garcia*, 73 Wis. 2d at 655. We believe this case to be such an exception. The factual situation presented here is implicated in both of the situations described in *Wyss*. First, the jury did not hear important DNA evidence that bore on an important issue of the case. Second, the testimony the jury heard with respect to the hair as affirmative proof of guilt was inconsistent with what the later DNA analysis revealed, thus clouding the crucial issue of identification.

Our case law supports this conclusion. In *State v. Cuyler*, 110 Wis. 2d 133, 327 N.W.2d 662 (1983), we addressed the issue of whether a case was fully tried when important opinion evidence was erroneously excluded from the trial. Like the facts of the present case, the defendant in *Cuyler* was charged with sexual assault. The trial became a credibility battle between the accuser and the accused. *Id.* at 136. In response to the victim's accusations, the defendant took the stand and denied any sexual contact, intercourse, or activity with the victim. To bolster the defendant's testimony, the defense attempted to introduce evidence as to defendant's character for truthfulness. *Id.* The circuit court ruled that two police officers could not testify on behalf of the defendant as to the defendant's character for truthfulness. This court exercised its statutory discretion to reverse the conviction of the defendant in the interests of justice and remand the case for a new trial. We stated that:

> The defendant was denied the right to bolster his credibility through the testimony of police officers who held opinions as to his truthfulness. The exclusion of this evidence adversely affected the defendant since credibility is a determinative issue in this case.

*Cuyler*, 110 Wis. 2d at 141.

In *Logan v. State*, 43 Wis. 2d 128, 168 N.W. 2d 171 (1969), the issue was whether the circuit court erroneously excluded admissible witness testimony that would have corroborated the defendant's story. The defendant was on trial for armed robbery. We concluded that the controversy was not fully tried because

> counsel's confusion [about an alibi defense] resulted in the omission of highly probative evidence, which, if believed, could have materially altered the result of the trial. It went directly to the crux of the case — the credibility of the defendant as contrasted with the credibility of the complaining witness.

*Id.* at 137.

In *Garcia v. State*, 73 Wis. 2d 651, 245 N.W. 2d 654 (1976), the defendant was on trial for intentionally discharging a firearm into a building. Two men were observed attempting to break into a shopping center. *Id.* at 651. Like the facts of the present case, the eyewitness in *Garcia* positively identified the defendant as one of the men she saw in the alley. *Id.* at 652. The defendant testified in his own behalf and denied he was present or had anything to do with the shooting incident. *Id.* at 653. The critical issues in the case were the identification of the defendant and his alibi. The defendant went through trial without revealing that his friend, who he wished to protect, had participated in the crime and could provide testimony exonerating the

defendant. In post-conviction motions, the defendant asked for a new trial based upon the testimony his friend would offer. This court granted a new trial in the interest of justice because we concluded that the controversy had not been fully tried. We reasoned:

> The administration of justice is and should be a search for the truth. The major facts in dispute at the trial were the identification of the defendant and his alibi that he was there. In this case all of the material evidence as to these issues was not presented to the jury. The testimony of a confessed participant to the shooting
>
> . . . to the effect that the defendant Richard Garcia was not there and in no way participated is very material and significant.
>
> . . .
>
> This is a close case but we believe the integrity of our system of administration of criminal justice should afford a jury the opportunity to hear and evaluate the evidence of the participant Rios. We therefore order a new trial.

*Id.* at 655-656.

The sole issue in the present case is identification: whether Hicks was the man that entered D.F.'s apartment and assaulted her. Here, the jury which found Hicks guilty did not have an opportunity to hear and evaluate evidence of DNA testing which excluded Hicks as the source of one of the four pubic hairs found at the scene. Instead, the jury was presented with evidence and argument that was later found inconsistent with the facts.

Hicks' theory at trial was that he had never been in D.F.'s apartment and could not have been the source of hairs that were found there. The hairs found at the scene, the State argued, supported the State's position

on this issue. Because the remaining physical and scientific evidence was inconclusive, the DNA test result could have been a crucial, material piece of evidence. The jury which rendered guilty verdicts against Hicks was not given the opportunity to hear relevant exculpatory DNA evidence that went directly to the issue of identification. This occurred not because of an erroneous ruling, but because the testimony did not yet exist. Cellmark had not yet performed the DNA testing at the time of trial.

By itself, the fact that Hicks obtained post-conviction DNA evidence might not persuade us to remand this matter for a new trial in the interest of justice. The determinative factor in the present case is the fact that the State assertively and repetitively used hair evidence throughout the course of the trial as affirmative proof of Hicks' guilt. The State went to great lengths to establish that the hairs found at the scene came from the assailant. In opening and closing arguments, the State relied heavily upon its expert's opinion that the hairs found at the scene were consistent with known standards provided by Hicks. At various times, the State referred to a "match" between the hairs, thus elevating and highlighting the importance of the hair evidence to the jury.

The combination of these two factors leads us to the conclusion that the real controversy was not fully tried.

The State's case was based on three components: (1) Hicks lived near the scene of the crime and was home the morning of the assault; (2) the victim identified Hicks; and (3) the State Crime Lab expert, Doerfer, testified that five Negro hairs found at the scene "could have" come from Hicks, and that a Caucasian head hair

164

found in the trousers Hicks was wearing the next day, "could have" been the victim's hair.

The State now attempts to downplay its use of the hair evidence at trial. However, a review of the record leads us to the opposite conclusion. The State used this hair evidence throughout the trial as affirmative proof of Hicks' guilt.

The State's initial statements to the jury included comments on the hair evidence:

> In this instance, what the analyst, who is "Karen Doerfer," will tell you is that, in the vacuum sweepings that were found on the floor in [D.F.'s] apartment, a Negro hair was found to *be consistent with the hair of Anthony Hicks.* [Transcript 102 (emphasis added)].
>
> . . .
> · You will be hearing about the collection of this evidence, about the analysis of this evidence.
>
> And I will, in fact, show you an enlargement of the hair comparison that Karen Doerfer conducted. And you'll get to see for yourself the *similarity between the known hair of Anthony Hicks and the hair that was found on [D.F.'s] floor*, after she was assaulted. [Tr. 103 (emphasis added)].

In response to these opening statements, even defense counsel acknowledged the importance of the hair evidence to the State's case. Defense counsel admitted:

> This case boils down to one simple issue. Did the pubic hair combings, the vacuuming combings — are those combings that of Mr. Hicks? [Tr. 106].

The State's theory at trial was that *all five* of the Negro hairs recovered at D.F.'s apartment came from the same person. The State's expert witness, Doerfer,

testified that, in her opinion after microscopic examination, four of these five hairs were "consistent" with a known sample from Hicks, and the fifth hair was "similar" to Hicks' hair. The jury was given the opportunity to examine two examples from which Doerfer reached her conclusion. Doerfer used an enlarged photograph of a microscopic view of a known and unknown hair labeled "Exhibit 38." She described for the jury the attributes of hair, viewed microscopically, which she said could be observed.

Defense counsel objected to the use of these photographic enlargements of the hair specimens, and argued that the enlargements were both overly prejudicial and suggestive to the jury. He stated:

> I don't have any objection to all four of the pictures being presented in this form.
>
> But the way that it is constructed here (indicates), I think, is suggestive. And that's my basic objection here. That is suggesting to the jury that, if you look at the comparisons as they are, then you can *match* this the best way you can. [Tr. 431 (emphasis added)].

The State in its briefs and arguments to this court now discounts the value of this evidence. However, in responding to the above objection at trial, the State argued just the opposite regarding the potency of this evidence, and in fact emphasized to the court the power and strength the hair comparisons would have on the jury:

> If Mr. Nunnery wants to say that's suggestive, he can argue that, all he wants, to the jury, and ask them to visualize it in another manner.
>
> Quite frankly, I don't believe that there is anything inherently suggestive at all about that.

166

Certainly, probative evidence is prejudicial to the defendant! That's the point of it! *The point of it is that it (the hair evidence) tends to make it more likely that he committed the crime. It's powerful. It's strong.* I can't help that, if those are the facts in this case. [Tr. 432-33 (emphasis added)].

. . .

And, certainly, I don't see, here, any prejudice, except for the fact that it's probative. *And it (the hair evidence) is probative evidence. That's for sure!* The prejudice, that Mr. Nunnery refers to, I don't see, apart from the probative value of this evidence. [Tr. 487-88 (emphasis added)].

At the post-conviction hearing, Hicks presented evidence that the DNA extracted from the hair pictured in Exhibit 38 did not come from him. A slide which contained the hair pictured in Exhibit 38 was transferred to Cellmark Diagnostics. A Cellmark biologist testified that Hicks was excluded as the source of the DNA which was extracted from the hair sample, labeled "01(3)," assuming that the DNA sample was from a single source. D.F. was also excluded as the source of this hair. The DNA analysis illustrates that Doerfer's opinion testimony was incorrect at least to hair specimen "01(3)."

In closing arguments, the State relied heavily upon Doerfer's opinion that the hairs found at the scene were consistent with or *"matched"* known standards provided by Hicks. The State argued its case to the jury with respect to the hair as follows:

Not only do we have a positive—as positive as it gets—identification by the victim of this crime of Mr. Hicks; but

In addition to that, there are the hair standards, the hair standards and unknowns, that were compared and found consistent.

And we have got not just one, not just the vacuum sweepings that come from the apartment—excuse me—that turn out to be consistent with his standards. But, lo and behold, there is a hair found on a —inside of his black pants, the inside leg of his black pants, that matches [D.F.].

Now how much do we want to ask from coincidence here?

You're going to hear a lot from Mr. Nunnery about how—and I agree—hair standards and hair comparisons are not "fingerprints." It cannot be said about the hair comparison that those—that hair (indicates) is [D.F.'s] hair and that hair (indicates) is Mr. Hicks' hair. That cannot be said about hair comparison.

All Ms. Doerfer could say to you is that she conducted this comparison and that they are consistent in all features that she examined. Okay?

But hair is not unique in the way that fingerprints are unique.

On the other hand, not all hair from black people is the same, as Mr. Nunnery would have had you believe. And not all hair from Caucasians is the same, as Mr. Nunnery would have you believe. That's not the case. Ms. Doerfer was quite clear on that.

(Pause)

We have a positive identification by the victim;

We have this man having an opportunity to have committed the crime; and

We have physical evidence that is consistent with all of those things—those vacuum combings (sic) at the foot of the bed—

Excuse me. Vacuum "sweepings." I don't want to confuse you about that.

168

—the vacuum "sweepings" from the foot of the bed and on the comforter, that are *found consistent with his head and pubic hair*, and the head hair on the inside of his pant leg. [Tr. 592-94 (emphasis added)].

Mr. Nunnery complains about 15 days! The mighty and powerful Madison Police Department waits 15 days to vacuum up the foot of [D.F.'s] bed!

Well, let me remind you that one of those hair samples came from the comforter. *One of the hair samples, that matched his, that was consistent with his*, came from the comforter that was seized that very morning.

The other hair samples came from the vacuumings.

And did it matter that they were 15 days later? *There were still hairs there that were consistent with his!* They were still laying there. If there had been—if the place had been cleaned out, and there had been nothing to vacuum up, and no hairs, yah, then, maybe, it might have mattered. But it didn't really matter that it was 15 days, did it! Those hairs were still there, where they had been, where they had fallen when he was in that apartment. They were still there, *to be matched up with his*.

The other hairs. Remember, the one that came out of his pants, that matched her head, was taken diligently when [D.F.] was taken for an exam and her hair standards were pulled.

And, when he's taken into custody, those pants are taken into custody. And, lo and behold, thats where her comparison, her hair comparison, comes from! [Tr. 630-31 (emphasis added)].

What overzealous activities did you find that the Madison Police Department engaged in?

Detective Anderson just, simply, did her job. "Here's a guy that matches the description. Let's put him in a line-up."

And, lo and behold, [D.F.] says, "That's him. I'm certain that's him."

And, lo and behold, he lives right—a minute and a half away from her!

And, lo and behold, *his hair matches up.*

And her hair is in his clothes! Her hair is in his clothes. [Tr. 644 (emphasis added)].

And, again, Mr. Nunnery would have you believe that all white people's hair looks alike and all black people's hair looks alike. . . . It's just not any white person's hair that's found inside those black pants. It is a hair that is consistent, in a number of characteristics, with [D.F.'s] head hair.

"Could have done DNA," Mr. Nunnery says. "The State, the all and mighty powerful State of Wisconsin," Mr. Nunnery says, "with it's infinite resources—infinite resources—could have done DNA." Well, it could not have done DNA! It tried to do DNA, sending it to an out-of-state laboratory. And that sample was insufficient.

The State Laboratory here does not have the capability to do DNA analyses.

You do not know, and neither does Mr. Nunnery, and neither do I, because there is no evidence that any of those hair, suspect hairs, had roots. The standards are taken so that roots are preserved. With the suspect hairs, we don't know if they've got roots.

Send all those out there, too, and we can find out that they're insufficient for analysis, and we can spend more of those tax dollars of your infinite resources—you, the State of Wisconsin, me, the State of Wisconsin—so that we can have more evidence that just doesn't quite match up to the videotape that Mr. Nunnery would have liked to have had in that apartment! [Tr. 645-646 (emphasis added)].

170

Based on a review of the record, we simply cannot say with any degree of certainty that this hair evidence did not influence the verdict. We are not unmindful of the "mobility" of hair evidence compared to other evidence such as blood or semen. Nevertheless, this is not a case in which the evidence proffered by Hicks tended to chip away at the accumulation of evidence produced by the State to prove guilt. The DNA test result, in conjunction with D.F.'s testimony about the source of the Negro hairs in her apartment, discredits one of the pivotal pieces of evidence forming the foundation of the State's case. D.F. unequivocally testified that no black males other than her assailant had ever been inside her apartment, and that at the time of the assault, it had been approximately two years since a black female had come to her door asking to borrow a blanket. To the extent that the jury may have had questions about the accuracy of D.F.'s identification, these questions were likely answered by the State's affirmative use of the hair evidence.

We are mindful of and sensitive to the anguish and anxiety a new trial will place upon the victim. No one doubts the horror of the events she suffered through, and the further anguish caused by her having to recount them. In a perfect world where truth could be ascertained and justice obtained without the trauma of a victim's testimony, a new trial would be unnecessary. We do not live in a perfect world. In cases such as this, we must depend upon the jury to deliver justice. To maintain the integrity of our system of criminal justice, the jury must be afforded the opportunity to hear and evaluate such critical, relevant, and material evidence, or at the very least, not be presented with evidence on a critical issue that is later determined to be inconsistent with the facts. Only then can we say with confidence

that justice has prevailed. *See Garcia*, 73 Wis. 2d at 655. The major issue in this case was that of identification. In view of the DNA evidence, the issue of identification was not fully tried.

■

There is no question that the State very capably and professionally presented its case to the jury. At the time of trial, neither of the parties was aware of what result a DNA analysis, if possible, could yield. Yet we must conclude that the real controversy was not fully tried inasmuch as: (1) the DNA evidence excluding Hicks as the donor of one of the hair specimens was relevant to the critical issue of identification; (2) the jury did not hear this evidence; and (3) instead, the State used the hair evidence assertively and repetitively as affirmative proof of Hicks' guilt. We cannot say with any degree of certainty that the hair evidence used by the State during trial played little or no part in the jury's verdict. Accordingly, we affirm the decision of the court of appeals and order a new trial in the interests of justice.

*By the Court.*—Affirmed.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). I believe that the issue briefed by both parties should be addressed: whether counsel should have informed the defendant that he could have subjected the pubic hairs found in the victim's apartment to DNA testing.

Section 4-3.8(b) of the ABA Standards for Criminal Justice (3d ed. 1993) states that "[d]efense counsel should explain developments in the case to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The commentary to § 4-3.8 states that "[t]he client should

172

be given sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so."

Prior to trial, the defendant's counsel was aware that the pubic hairs found in the victim's apartment could be subjected to a new form of DNA testing. Counsel did not inform the defendant of this option. I believe that defense counsel should inform an accused of the prospect of DNA testing and that the decision whether or not to proceed with testing should be made by the accused. As the commentary to § 4-3.8 states, "[a] lawyer must remember that the case is the defendant's case, and the defendant is entitled to know of the progress of the lawyer's work."

In view of my conclusion regarding counsel's obligations, I turn to the question of whether the defendant was prejudiced. I agree with the dissent that the defendant cannot meet the burden prescribed by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 696 (1984), requiring him to show "that the decision reached would reasonably likely have been different" if the alleged errors had not been made.

I nevertheless concur in the result reached by the majority because, as I have stated previously, I conclude that under Article I, § 7 of the Wisconsin Constitution and this court's longstanding harmless error analysis, *State v. Dyess*, 124 Wis. 2d 525, 370 N.W.2d 222 (1985), the State should be required to prove beyond a reasonable doubt that errors made by an accused's counsel were harmless. *See State v. Sanchez*, 201 Wis. 2d 219, 239, 548 N.W.2d 69 (1996) (Abrahamson, J., concurring). The State's own trial strategy placed a great deal of emphasis on an assumed

match between the pubic hairs found in the victim's apartment and the defendant's pubic hairs. Hence I conclude that the State cannot meet the burden of proving that there is no reasonable probability that the alleged error contributed to the conviction.

For the reasons set forth, I concur in the mandate.

DONALD W. STEINMETZ, J. (*dissenting*). The issue presented for review in this case by *both* parties is whether defendant Hicks' Sixth Amendment right to effective assistance of counsel was violated by his attorney's choice not to pursue DNA testing which could have resulted in exculpatory evidence. Although the issue on appeal was clearly formulated, the majority has determined that this court should instead answer an entirely different question: whether the real controversy of identification was fully tried. Despite the majority's attempt at avoiding the real controversy, it cannot evade the circularity of its own argument: its conclusion that the issue of identification was not fully tried is based ultimately on the fact that Hicks' attorney did not seek DNA testing. No matter how stated, this case revolves around the conduct of Hicks' attorney and whether his conduct resulted in prejudice to Hicks. Although, the trial court, the court of appeals and both parties understood this, the majority decided the case on the basis that the true issue had not been tried. This issue was not raised before this court.

Sixth Amendment ineffective assistance of counsel claims must be analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the United States Supreme Court held that a defendant claiming ineffective assistance of counsel must establish that:

174

(1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Id.* at 687

It is not necessary, however, to address whether Hicks' attorney's performance was deficient in this case since Hicks cannot meet the second prong of *Strickland.* Under the second prong, a defendant's Sixth Amendment right is not violated unless he proves that "the decision reached [by the jury] would have been different absent the [alleged] errors" of counsel. *Strickland*, 466 U.S. at 696. Considering the limited exculpatory value of the DNA testing and the abundance of other inculpatory evidence that was presented at trial, such a position is not tenable in this case.

The DNA test results, which the majority finds so significant, actually have limited exculpatory value. There were only two pubic hairs that were tested successfully, sample 012 and sample 013. The defendant's expert could not say that the defendant was excluded as the source of sample 012. The testing on this sample was completely inconclusive: it neither established nor discredited Hicks' guilt. As for sample 013, defendant's expert was perfectly clear in stating that Hicks could only be excluded from being the source of this sample if it was assumed that there was only one source of DNA present on the sample. However, Hicks' expert could not guarantee that there was not another source of DNA, such as blood or saliva, present. In fact, Hicks' expert did not even perform the test which could have determined this fact. The exculpatory value of sample 013 is purely conditional; it is still possible that Hicks was the source.

Sample 013's exculpatory value is lessened even further when one takes into account the possibility that the pubic hair could have been another person's. Although the victim testified that she had never had a

black man in her apartment before the assault, the record clearly shows that many different people entered her apartment *after* the assault during the two weeks before the vacuum sweep discovered the hairs. Also, it is not inconceivable that another person's pubic hair was carried into the apartment by Hicks in some manner. Finally, it is also possible that pubic hair was present in the victim's apartment before she even moved in.

Considering all of these possibilities, the exculpatory value of the DNA testing is suspect at best. Even if it has some value, though, it cannot overcome the additional overwhelming inculpatory evidence that was presented at trial. First, the victim positively identified Hicks as her assailant two days after the assault in a police line-up. There is no reason to doubt the veracity of this identification; the victim testified she had ample opportunity to view Hicks during the assault. In fact, she remembered Hicks saying: "You've seen me. You've seen me . . . If I'm going to go to jail for something, I may as well get something for it. " Second, shortly after the assault, the victim spent two hours with a police sketch artist who produced a drawing of the assailant's face. This drawing bears an uncanny resemblance to Hicks. Third, a piece of Caucasian hair, which the State's expert identified as similar to the victim's, was found in the defendant's pants when he was arrested. Finally, Hicks, who lived upstairs in the apartment complex, testified that around the time of the incident he was home from work because he was "sick." Although the defense attempted to support this alibi with the testimony of his live-in girlfriend, it was significantly discredited by the State at trial. More importantly, even his girlfriend's testimony did not

176

account for Hicks' whereabouts during the exact time of the assault.

Between the lack of exculpatory value of the DNA testing, and the abundance of other inculpatory evidence presented at trial, it is inconceivable that the lack of the DNA evidence resulted in prejudice great enough to alter the trial's outcome. This was the conclusion reached by the trial court, which had the opportunity to witness the credibility and demeanor of the witnesses, and this is the only conclusion that can be reached by this author after carefully reviewing the record. As such, Hicks' Sixth Amendment claim should fail. Unfortunately, perhaps realizing the difficulty in finding ineffective assistance of counsel in this case, the majority has framed the issue as a question of identification and, in turn, has granted a new trial to man convicted as a rapist by 12 of his peers, which will require the victim to testify again as to this personally violent attack.

I am authorized to state that JUSTICE JON P. WILCOX joins this dissenting opinion.