STATE of Wisconsin, Plaintiff-Respondent,

v.

Suzette M. WARD, Defendant-Appellant.†

Court of Appeals

*No. 98–2530–CR. Submitted on briefs April 13, 1999.—Decided May 13, 1999.*

(Also reported in 596 N.W.2d 887.)

†Petition to review denied.

 *Affirmed in part and reversed in part.*

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Trish Arreazola* of *Sedor & Hoag, S.C.* of Janesville.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *James M. Freimuth*, assistant attorney general.

Before Dykman, P.J., Vergeront and Deininger, JJ.

DYKMAN, P.J. Suzette M. Ward appeals from a judgment convicting her of four counts of failing to act to protect a child from sexual assault, contrary to § 948.02(3), STATS. She argues that the trial court erred when it instructed the jury that a "person responsible

for the welfare of a child" under § 948.01(3), STATS.,[1] included a person "used by" one legally responsible for the child's welfare to exercise temporary control or care for the child. We do not have the power to directly address this issue. She also contends that the evidence is insufficient to sustain her convictions. We disagree. Finally, she argues that the trial court erred when it ordered her to pay a deoxyribonucleic acid analysis (DNA) surcharge pursuant to § 973.046, STATS. We agree. Accordingly, we affirm in part and reverse in part, and order that the DNA surcharge be removed from the judgment.

## BACKGROUND

In 1997, Suzette (Sue) Ward lived with her husband, Gary Ward, in a Beloit trailer park. Three young girls, ten-year-old LeRay K., eight-year-old Chassidy R., and ten-year-old Lacey D., lived in the same neighborhood as the Wards. During the summer of 1997, the Wards often invited the girls over to play on their computer, watch movies, eat pizza and sleep over. Sue Ward told the children's parents that their children were welcome at her home, and that she was happy to have them there. Sometimes Ward would ask the parents if it would be all right if their child could come over and stay the night. The parents consented but never paid Ward for caring for their children.

---

[1] Section 948.01(3), STATS., defines a "[p]erson responsible for the child's welfare" to include:

> [T]he child's parent; stepparent; guardian; foster parent; treatment foster parent; an employe of a public or private residential home, institution or agency; other person legally responsible for the child's welfare in a residential setting; or a person employed by one legally responsible for the child's welfare to exercise temporary control or care for the child.

Each of the girls later testified that sometimes when they were over at the Wards' home, the Wards would show them pornographic movies or computer screen images of children, cartoon characters and adults engaging in sexual activity. They also testified that Gary Ward sexually assaulted them in Sue Ward's presence. The details of these assaults are not pertinent to this appeal.

The jury found Sue Ward guilty of four counts of failing to protect a child from sexual assault, contrary to § 948.02(3), STATS., and two counts of exposing a child to harmful material, party to a crime, §§ 948.11(2) and 939.05, STATS. She appeals from her convictions under § 948.02(3).

## DISCUSSION

### 1. *Jury Instructions*

Ward argues that the trial court erroneously instructed the jury regarding one of the elements needed to convict her for violating § 948.02(3), STATS.[2] However, at the instructions conference, the trial court said: "I'm giving counsel . . . copies of a set of proposed jury instructions, and I'll give you some time to look

---

[2] Section 948.02(3), STATS., reads as follows:

A person responsible for the welfare of a child who has not attained the age of 16 years is guilty of a Class C felony if that person has knowledge that another person intends to have, is having or has had sexual intercourse or sexual contact with the child, is physically and emotionally capable of taking action which will prevent the intercourse or contact from taking place or being repeated, fails to take that action and the failure to act exposes the child to an unreasonable risk that intercourse or contact may occur between the child and the other person or facilitates the intercourse or contact that does occur between the child and the other person.

those over." Among the proposed instructions was an instruction to which Ward now objects. After giving the parties an opportunity to review the instructions, the court asked if either party had any objection. Ward's attorney answered, "None, Your Honor."

In *State v. Schumacher*, 144 Wis. 2d 388, 409, 424 N.W.2d 672, 680 (1988), the court considered § 805.13(3), STATS., which provides that if a party fails to object to an instruction at the instructions conference, he or she has waived an objection to the instruction. The court considered the effect § 805.13(3) had on the court of appeals and the supreme court and concluded that the court of appeals had no power to reach waived issues concerning unobjected-to jury instructions. The court then decided the substantive issue, concluding that while the court of appeals had no power to consider unobjected-to jury instructions, the supreme court did.

We conclude that we do not have the power to address Ward's argument regarding the unobjected-to jury instructions. However, Ward argues that in her motion to dismiss, which she made prior to the instructions conference, she objected to the State's characterization of her as a person responsible for the victim's welfare. She concludes that she did not waive her objection even though she failed to raise it at the instructions conference. Ward cites no authority for this proposition, and we know of none. *Schumacher* is explicit. Failure to object to an alleged improper instruction is more than a waiver of the right to thereafter object to the instruction. If no objection is made, this court is without the power to consider the objection.

305

The *Schumacher* court explained that while the court of appeals does not have the power to review unobjected-to jury instructions, we have a discretionary power to reverse under § 752.35, STATS. But, as *Schumacher* points out, this is a limited power of reversal. There are two parts to a § 752.35 analysis. The first is a "real controversy not fully tried" inquiry. *See State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435, 439 (1996). The real controversy is said not to have been tried:

> (1) when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case; [or] (2) when the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried.

*Hicks*, 202 Wis. 2d at 160, 549 N.W.2d at 440. Ward does not assert that either of these situations occurred.

The second part to a § 752.35 inquiry is whether a miscarriage of justice has occurred. A reversal on this basis requires a conclusion by this court that the defendant should not have been found guilty and that justice demands the defendant be given another trial. *See State v. Wyss*, 124 Wis. 2d 681, 736, 370 N.W.2d 745, 771 (1985), *overruled on other grounds by State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990).

Ward argues that the jury was improperly instructed that a person who was "used by" a parent could be found guilty of failing to act to protect a child from sexual assault. She contends that without this improper instruction, she would not have been found guilty. Section 948.02(3), STATS., requires that an element of the offense of failing to protect a child from sexual assault is that the defendant be "[a] person

responsible for the welfare of the child." As defined in § 948.01(3), STATS., this can include "a person employed by one legally responsible for the child's welfare . . . ."

In *State v. Sostre*, 198 Wis. 2d 409, 542 N.W.2d 774 (1996), the court held that a person may be responsible for the welfare of a child if he or she is "used by" the child's legal guardian to act as a caretaker for the child. *Id.* at 411, 542 N.W.2d at 775. The court used a dictionary to conclude that a synonym of "employed" is "to make use of." Thus, even though the defendant in *Sostre* was the equivalent of an unpaid baby-sitter, he was still legally responsible for the child he assaulted.

While we recognize that there are factual distinctions between *Sostre* and this case, we are satisfied that the supreme court's use of the term "used by" is consistent with the legislature's intent of broadly defining the category of persons responsible for the child's welfare. *See Sostre*, 198 Wis. 2d at 415, 542 N.W.2d at 776. Therefore, all that is necessary for this element of the crime to be proven is that the person legally responsible for the child's welfare "make use of " a person who then knowingly fails to prevent the sexual assault of the child. The trial court therefore did not erroneously exercise its discretion by instructing the jury that "a person employed *or used by* one legally responsible for the child's welfare to exercise temporary control or care for the child" could be found guilty of failing to act to protect a child from sexual assault. In the absence of an erroneous instruction, we cannot conclude that justice has miscarried and that Ward would be found not guilty at a second trial. We therefore decline to exercise our power of discretionary reversal under § 752.35, STATS.

Ward contends that by adding the "used by" language, the court expanded who could be held liable under the statute to such a degree that the State was essentially relieved of its burden of proving that she was a "person responsible" under the statute. She points out that a jury instruction that relieves the state of its burden to prove all of the elements of a charge beyond a reasonable doubt deprives the defendant of due process. *See State v. Kuntz*, 160 Wis. 2d 722, 467 N.W.2d 531 (1991). We find no merit to this contention. The State was not relieved of its burden of proving that Ward was a "person responsible" for the children's welfare. It still had to prove beyond a reasonable doubt that she was a person the children's parents "used" to exercise temporary control or care for their child.

### 2. *Sufficiency of the Evidence*

Ward argues that even if the jury instruction was correct, the evidence was insufficient to show that she was employed or used by the children's parents to exercise temporary control or care for their children. She points out that the children's parents never expressly asked her to care for their children and never offered to pay her any money. She asserts that the children came to her home, sometimes invited and sometimes uninvited, sometimes with their parents' knowledge and consent and sometimes without it, to play on her computer, watch movies, and eat pizza. Ward's position essentially is that there was no express or implied arrangement between her and the children's parents in which she accepted responsibility for being the children's caregiver.

In *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752, 757–58 (1990), the supreme court set out our standard of review regarding challenges to the suf-

ficiency of the evidence supporting a criminal conviction:

> [I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it.

*Id.* (citations omitted).

The children's parents testified at trial regarding how they each viewed their relationship with Ward. LeRay's mother testified that Ward told her that LeRay was always welcome to come over to her trailer. LeRay's father testified that Ward came over a few times and asked if it would be okay for LeRay to come over to their trailer to watch movies, play games, eat pizza and stay the night. While LeRay's mother and father stated that they never paid Ward to baby-sit her daughter, they still expected her to care for their child when she was at her home.

Lacey's mother also testified that she checked with Ward before allowing Lacey to spend the night, and Ward apparently told her that "she would be happy to have Lacey come spend the night and that they had bought movies and popcorn and . . . just enjoyed having the kids around." Lacey's mother testified that she gave Ward her phone number in case of problems. Lacey's mother testified that she never paid Ward to

baby-sit her daughter, but she too expected the Wards to take care of Lacey when she stayed at their home.

Chassidy's mother testified that on September 6, 1997, when she and Chassidy went over to the Wards, Ward said that she would "love" to have Chassidy stay over night. In fact, Chassidy's mother stated that Ward told her that anytime she needed to work or wanted to go out, Chassidy was welcome to stay at the Ward's trailer.

In light of this testimony and the surrounding circumstances, we conclude that a jury could reasonably infer that there was an implied agreement between the parents and Ward that Ward would care for their children when they were at her home. This is not a situation of a parent not knowing the whereabouts of a child, or a situation in which parents have left their child with someone who they have no reasonable expectation to believe would care for their child; it is exactly the opposite.

The evidence suggests that Ward told the parents that their children were welcome at her home, and that they were welcome to spend the night. Ward even requested some of the parents' permission to have their children come to her home so that she could provide them with food, entertainment and a place to sleep. While no payments were made, it is reasonable to infer that the children's parents used Ward to care for their children during these evenings in which the assaults occurred. We therefore are satisfied that there is sufficient evidence to uphold the jury's verdict.

310

### 3. *DNA Surcharge*

Finally, Ward argues that the trial court erred when it imposed a $250 DNA surcharge, pursuant to § 973.046, STATS. Section 973.046(1), states:

> If a court imposes a sentence or places a person on probation under any of the following circumstances, the court shall impose a deoxyribonucleic acid analysis surcharge of $250:
>
> (a) The person violated s. 940.225 or 948.02 (1) or (2).
>
> (b) The court required the person to provide a biological specimen under s. 973.047(1).

■

Ward was convicted of violating §§ 948.11(2) and 948.02(3), STATS.; however, there is no indication in the record that the trial court ordered her to provide a biological specimen. The trial court therefore erred in imposing the surcharge. We reverse the court's finding regarding the surcharge and order that the payment requirement be removed from the judgment of conviction. Accordingly, we affirm in part and reverse in part.

*By the Court.*—Judgment affirmed in part and reversed in part.