STATE of Wisconsin, Plaintiff-Respondent,

v.

JEFFREY A. W., Defendant-Appellant.

Court of Appeals

*No. 2009AP645–CR. Submitted on briefs November 24, 2009.
—Decided January 13, 2010.*

**2010 WI App 29**

(Also reported in 780 N.W.2d 231.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Hans P. Koesser* of *Koesser Law Office, S.C.*, of Kenosha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Thomas J. Balistreri*, assistant attorney general.

Before Brown, C.J., Neubauer, P.J. and Anderson, J.

¶ 1. BROWN, C.J. A jury convicted Jeffrey A.W. of repeated sexual assault of his daughter, AMK, when she was three years old. AMK was a teenager when this came to light and she testified that she came forward because she now has herpes and said that it could only have come from her father, the single person to have had sexual contact with her. Jeffrey testified that he did not sexually assault his daughter and did not have herpes. Thus, whether Jeffrey had herpes was a central component of the case. But Jeffrey had no scientific evidence to prove that he did not have herpes and the prosecutor took advantage of that fact. Now, after conviction, he has a test that shows that he does not have herpes and an expert to say that the test is 99.8% accurate. The determinative issue in this case is whether this after-the-trial test result should afford him a new trial in the interest of justice. Because the credibility battle turned on whether Jeffrey had herpes and the prosecutor's theme was that Jeffrey had no accurate test result to confirm that he did not have herpes and because an accurate test was actually available at the time of trial but Jeffrey's counsel did not ask the right people to get the right answers about the availability of such a test, the jury never heard what, in

544

fairness, it should have heard. The real issue was therefore not tried and we reverse and remand with directions.

## Background

¶ 2. AMK told the police that between May 1994 and May 1995, when she was three years old, Jeffrey sexually assaulted her three times by mouth-to-genital contact. When AMK was five, she spoke with a guidance counselor about the sexual assaults, but she refused to talk to the police. In 2006, when she was fifteen, AMK found out that she had genital herpes. She then told the police about the sexual assault.

¶ 3. The trial that soon followed was a he-said-she-said credibility battle. The prosecution's case-in-chief consisted of evidence that Jeffrey sexually assaulted AMK three times, she had no other sexual encounters, and she now had herpes which must have come from Jeffrey. The doctor who examined AMK and diagnosed her with herpes testified that AMK's herpes does not occur spontaneously and had to have been transmitted through oral-genital sex. The doctor also testified that the herpes virus is usually asymptomatic or dormant, sometimes for as long as twenty to forty years.

¶ 4. Jeffrey took the stand in his own defense. He testified that he never had sex with AMK, did not have herpes, that because AMK took birth control pills, she may be sexually active, that he and AMK's mom were going through a very hostile divorce when AMK first alleged that he sexually assaulted her, and theorized that the divorce may have caused AMK to make the story up. Both he and his current wife testified that neither one of them had ever been treated for a sexually

545

transmitted disease. Nor did they notice any cold sores or other outbreaks that would indicate the presence of a sexually transmitted disease.

¶ 5. The prosecutor's closing statement focused primarily on discrediting Jeffrey. It targeted Jeffrey's denials that he had herpes or sexual contact with AMK, and Jeffrey's claim that AMK must have contracted herpes from someone else. The prosecutor stated that

> the only way [AMK] could have gotten those sores, the herpes on her vagina, is through mouth[-]to-vagina contact. That's the testimony here. And the only evidence of mouth-to-vagina contact is [AMK's] testimony that [Jeffrey], when [AMK] was three years old, licked her vagina. That's the only evidence.

> Now [Jeffrey] tried to suggest some sexual activity by [AMK], by pointing out that she takes birth control pills. But like many people she testified, and her mom corroborated, that she was prescribed those birth control pills to regulate her period. This is a common thing. For no other reason does she take birth control pills.

> [Jeffrey] points out that this type 1 virus can also be transferred by genital-to-genital contact, so if there was evidence of genital-to-genital contact she could have gotten the virus in her genitals. But there is no evidence of that whatsoever.

> . . . .

> Now [Jeffrey] says, I have never had a cold sore. His new wife says, he's never had a cold sore. But you have to consider the credibility of the witnesses here.

> . . . .

> And he says, I never had a cold sore. His wife says he never had a cold sore. Where's the doctor to say he doesn't have herpes?

. . . .

> I would feel much better about the existence or nonexistence of the herpes simplex type 1 virus in [Jeffrey's] body if I had a doctor saying that, but we didn't have that. We just have what [Jeffrey's second wife] said and what [Jeffrey] said.

¶ 6. After conviction, with two negative herpes test results in hand, Jeffrey moved for postconviction relief on the grounds that his trial counsel was ineffective and a new trial was warranted in the interest of justice. The postconviction court denied the postconviction motion. Further facts will be forthcoming as necessary.

## Discussion

### *Whether Trial Counsel was Ineffective*

¶ 7. On appeal, Jeffrey asserts that his trial counsel was ineffective because she "failed to have [him] tested for herpes prior to trial and failed to procure an expert to introduce these results at trial." Though Jeffrey admits that his trial counsel tried to understand the current state of herpes testing and obtain expert assistance, he claims that the attempt was "not good enough" since she still failed to have him tested. Because of this failure, Jeffrey argues that the jury did not hear relevant exculpatory evidence which went directly to his and AMK's credibility. And Jeffrey further emphasizes that the State repeatedly pointed out the absence of this evidence to attack his credibility.

¶ 8. The analytical framework for assessing the merits of an ineffective assistance of counsel claim is well known. To sustain a claim of ineffective assistance

of counsel, a defendant must show both that counsel's performance was deficient, and that counsel's errors were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Whether counsel's performance falls below the constitutional minimum is a question of law subject to our independent review. *State v. McDowell*, 2004 WI 70, ¶ 31, 272 Wis. 2d 488, 681 N.W.2d 500. A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one. *See Strickland*, 466 U.S. at 697.

■■

¶ 9. We will start with whether Jeffrey showed that his trial counsel's performance was deficient. We make every effort "to avoid determinations of ineffectiveness based on hindsight . . . and [start with] a strong presumption that counsel acted reasonably within professional norms." *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). Performance is deficient if it constitutes an irrational trial tactic or if it is the exercise of professional authority based upon caprice rather than upon judgment. *State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983). We will examine counsel's conduct to be sure it is more than just acting upon a whim; there must be deliberateness, caution, and circumspection. *Id.*

¶ 10. Trial counsel's testimony at the *Machner*[1] hearing established the following. Trial counsel thought that whether Jeffrey had herpes might be an issue so she reviewed every website she could possibly think of about the herpes virus and testing. She also had her office investigator do research and corresponded with Jeffrey and Jeffrey's second wife about

---

[1] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

her research. Counsel learned that the blood test for herpes was not terribly accurate and to get a truly accurate test you needed an open sore to swab, which Jeffrey did not have. But she did not want to rely on the internet alone, so she also attempted to contact various doctors, experts, professionals, all of the attorneys in the state public defender's office, and whoever else she thought might be helpful. But those she contacted either responded that they could not answer her questions, or worse, did not respond at all. Trial counsel subsequently spoke with Jeffrey's physician, who also informed her that blood tests for herpes were not definitive; an open sore was needed for an accurate test. Trial counsel then decided not to have Jeffrey tested because she did not think the results would have sufficient probative weight in the jury's eyes. She also feared a false positive, which in her opinion would have been far more detrimental to Jeffrey's case than not having a test done at all.

¶ 11. But, at the postconviction hearing, Jeffrey produced an expert who explained that Jeffrey's trial counsel's research yielded incorrect information. The expert explained that better tests had been approved in the last couple of years that were more "sensitive" and "specific." Moreover, these tests were available at the time of trial. The expert informed the court that the herpes tests Jeffrey took after trial produced a 99.8% accurate negative result. Further, contrary to trial counsel's conclusion, the expert noted that the herpes test has only a 0.2% chance of a false positive, and the more prevalent error was a false negative.

¶ 12. There is no question that trial counsel's investigation yielded the wrong information. But that does not necessarily equate to deficient performance.

She tried her best. She just looked in the wrong places. She recognized the importance of the issue and the need for a valid test if she could find it, researched the issue with deliberation, sought to corroborate her online research by attempting to speak with medical professionals about her tentative conclusions, and judged from this information and her conversation with Jeffrey's physician that the herpes test was not very accurate, could result in a false positive, and thus would not be very helpful to the jury. Given this level of research, and especially the fact that Jeffrey's own physician confirmed her research, we uphold the trial court's finding that counsel's decision to forego herpes testing was a reasonable professional judgment and not deficient. Her investigation was not outside the range of professionally competent assistance as illustrated by prevailing professional norms. *See Johnson*, 153 Wis. 2d at 127. Jeffrey has not proven that his trial counsel was ineffective.

### Whether a New Trial is Warranted in the Interest of Justice

¶ 13. Jeffrey next argues that the interest of justice requires a new trial because the real controversy of the witnesses' credibility was not fully tried. He contends that we should exercise our discretionary reversal powers under WIS. STAT. § 752.35 (2007–08)[2] to allow the jury to appraise the witnesses' credibility after hearing the herpes test results.

¶ 14. We may exercise our discretionary reversal powers when the real controversy was not fully tried to

---

[2] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

the court. *Vollmer v. Luety*, 156 Wis. 2d 1, 19–20, 456 N.W.2d 797 (1990).[3] When reversing on this basis, we need not first conclude that the outcome would be different on retrial. *Id.* at 19. Instead, we reverse to maintain the integrity of our system of criminal justice and so that we can say with confidence that justice has prevailed. *State v. Hicks*, 202 Wis. 2d 150, 171–72, 549 N.W.2d 435 (1996).

¶ 15. Jeffrey compares the facts of this case to *Hicks*, in which our supreme court granted a new trial in the interest of justice. *Id.* at 159. The facts in *Hicks* are as follows. Hicks was convicted of burglary and sexual assault after a jury trial. *Id.* at 152. The accuser testified at trial that a black man came into her apartment, sexually assaulted and robbed her, and that no black male was ever in her apartment before the assault. *Id.* at 153–55. The State found hair specimens, blood, saliva, and semen at the scene. *Id.* at 155. The State's serological testing on the physical evidence, however, was inconclusive, though the hair specimens in the accuser's apartment were "consistent" with the samples Hicks provided. *Id.* at 154–55. A DNA analysis was not conducted on the hair specimens before trial. *Id.* at 152. The remaining evidence on identification was testimonial. *See id.* at 153–55.

¶ 16. After Hicks was convicted and sentenced, he moved for a new trial based on new DNA evidence from the hair specimens. *Id.* at 155–56. The DNA analysis excluded him from the source of all the hair specimens which yielded DNA sufficient for conclusive analysis.

---

[3] Cases from our supreme court interpreting the power of the supreme court to reverse judgments under Wis. Stat. § 751.06 are equally applicable as interpreting the power of the court of appeals to reverse judgments under Wis. Stat. § 752.35. *Vollmer v. Luety*, 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990).

*Id.* The *Hicks* court concluded that the new DNA evidence meant the real controversy was not fully tried because of two factors: (1) the jury did not hear DNA evidence excluding Hicks as the donor of one of the hair specimens which was relevant to the critical issue of identification and (2) the testimony the jury did hear with respect to the hair as affirmative proof of guilt was inconsistent with what the later DNA analysis revealed, thus clouding the crucial issue of identification. *See id.* at 161.

¶ 17. *Hicks* also repeatedly emphasized that the new exculpatory evidence alone was not the determinative factor in its decision to reverse. The court explained that the decisive fact was that

> the State assertively and repetitively used hair evidence throughout the course of the trial as affirmative proof of Hicks' guilt. The State went to great lengths to establish that the hairs found at the scene came from the assailant. In opening and closing arguments, the State relied heavily upon its expert's opinion that the hairs found at the scene were consistent with known standards provided by Hicks. At various times, the State referred to a "match" between the hairs, thus elevating and highlighting the importance of the hair evidence to the jury.

*Id.* at 164. And the court also noted that any questions the jury may have had about the accuracy of the accuser's identification were likely answered by the State's affirmative use of the hair evidence, since the accuser unequivocally testified that no other black males had ever been inside her apartment. *Id.* at 171. The court observed that, had the DNA evidence been presented, it may have acted to discredit one of the pivotal pieces of evidence forming the foundation of the State's case. *Id.* Therefore, the court concluded that the

facts in its case were easily distinguishable from other cases where the new evidence only "tended to chip away at the accumulation of evidence produced by the State to prove guilt." *Id.*

¶ 18. The significance of the new evidence in this case is quite similar to that in *Hicks.* Here, the State aggressively used the lack of a herpes test to impugn Jeffrey's credibility. We cannot say that these assertions were a mere "chip" in contrast with AMK's testimony. Rather, it was AMK's testimony, combined with Jeffrey's failure to corroborate his claim that he did not have herpes by some objective test result, which made the State's case so viable. We cannot say that this did not affect the jury's decision to believe AMK's story over Jeffrey's.

¶ 19. In so holding, we reject the State's arguments that this is not a *Hicks* case. The State first cites *State v. Hubanks*, 173 Wis. 2d 1, 496 N.W.2d 96 (Ct. App. 1992), for the proposition that an accused may not complain that he or she should have a new trial in the interest of justice because of an unsatisfactory strategy reasonably pursued by competent counsel. But this case has nothing to do with a strategic choice by counsel to pursue one strategy over another and everything to do with counsel going to trial with half-a-loaf because she could not find the other half. Her research, as well-intentioned as it was, did not provide her with the ammunition she needed and so she was forced to do with less. There was no strategic choice made here. For the same reason, we reject the State's reliance on *State v. Van Buren*, 2008 WI App 26, ¶ 20, 307 Wis. 2d 447, 746 N.W.2d 545 (refusing to order a new trial because the defendant wanted to use the evidence to support a new defense strategy). And we also reject reliance on *State v. Maloney*, 2006 WI 15, ¶¶ 36–37, 288 Wis. 2d

551, 709 N.W.2d 436 (refusing to allow a defendant to present a different theory after the one presented by competent counsel years before).

¶ 20. Next, the State cites a footnote in *State v. Flynn*, 190 Wis. 2d 31, 49 n.5, 527 N.W.2d 343 (Ct. App. 1994), for the proposition that the power of discretionary reversal should not be used when a defendant failed to prove that his attorney was ineffective, even when a question remained whether the attorney performed deficiently by not fully trying the case. But the issue here is not whether the attorney failed to fully try the case. She did the best she could with what she had. Rather, there was a test out there that was available at the time of trial which could have had great impact on the credibility battle between the prosecutor and the defendant, had it been presented. But, through no one's fault, the jury did not hear this evidence. The case before us is a *Hicks* case.

¶ 21. Finally, it is fitting that we repeat at length the observation made by our supreme court in *Hicks* about the court's sensitivity to the anguish and anxiety a new trial places upon a victim:

> In a perfect world where truth could be ascertained and justice obtained without the trauma of a victim's testimony, a new trial would be unnecessary. We do not live in a perfect world. In cases such as this, we must depend upon the jury to deliver justice. To maintain the integrity of our system of criminal justice, the jury must be afforded the opportunity to hear and evaluate such critical, relevant, and material evidence, or at the very least, not be presented with evidence on a critical issue that is later determined to be inconsistent with the facts. Only then can we say with confidence that justice has prevailed.

*Hicks*, 202 Wis. 2d at 171–72.

554

¶ 22. We are not comfortable with having to reverse and remand but we feel compelled to do so. Here, AMK's testimony centered around the fact that she had herpes and the assertion that she would not have contracted it but for her father's assaults on her, the only person with whom she had sexual contact. Therefore, whether Jeffrey did or did not have herpes was of utmost importance in determining the credibility of the parties. We simply do not have confidence that justice has prevailed especially since the State—as part of its strategy—assailed Jeffrey's credibility by pointing out the lack of a test corroborating his assertion of being herpes-free. We thus reverse and remand for a new trial where Jeffrey will be free to present the test results. It may well be that a new jury will be convinced, beyond a reasonable doubt, that Jeffrey sexually assaulted his daughter. But that will be after the jury has heard evidence on a critical issue in the case.

*By the Court.*—Judgment and order reversed and cause remanded with directions.