COURT OF APPEALS
DECISION
DATED AND FILED

May 14, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP1860**

STATE OF WISCONSIN

Cir. Ct. No.  1993CF74

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

TODD D. FROST,

    DEFENDANT-APPELLANT.

         APPEAL from an order of the circuit court for Wood County: RICHARD A. RADCLIFFE, Judge. *Affirmed.*

         Before Blanchard, Kloppenburg, and Taylor, JJ.

         **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1　PER CURIAM.　In 1994, a jury convicted Todd D. Frost of first-degree intentional homicide for the murder of A.B.[1]　Frost was sentenced to life imprisonment, with a parole eligibility date in 2034.　Since Frost's conviction, he has unsuccessfully pursued a direct appeal and, in 2002 and 2014, motions for relief pursuant to WIS. STAT. § 974.06.　In 2020, Frost brought a third postconviction motion for a new trial pursuant to § 974.06, and a motion to reconsider the circuit court's denial of his 2014 postconviction motions for additional forensic testing of evidence pursuant to WIS. STAT. § 974.07.　The latter motion was granted by the court and additional forensic testing of evidence was ordered.　Extensive postconviction litigation resulted, extending over three years, in which Frost brought additional motions for relief and which culminated in a two-day evidentiary hearing.　Frost's motions for a new trial were denied by the court.　Frost appeals.

¶2　Frost argues that the circuit court erred in denying his postconviction motions for a new trial on three grounds: (1) newly discovered evidence concerning the purported false trial testimony of Sherry Culhane, a forensic scientist at the Wisconsin Crime Laboratory, and exculpatory semen evidence; (2) due process violations as a result of the purported false trial testimony of Culhane and the State's failure to disclose the exculpatory semen evidence; and

---

[1] Consistent with the policy of protecting victim privacy under WIS. STAT. RULE 809.86(4) (2023-24), we use initials that do not correspond to the victim's name.　We refer to the lay witnesses at trial using initials that correspond to each lay witness's actual name.　We use actual names to refer to all other individuals including Frost, members of law enforcement, and expert witnesses.

All references to the Wisconsin Statutes are to the 2023-24 version.

(3) in the interest of justice. For the following reasons, we reject these arguments and affirm.

## BACKGROUND

¶3 On the morning of April 1, 1993, A.B.'s body was discovered in her bedroom by her housemate and her housemate's friend after their return from a night out. A.B.'s throat was cut and her body stabbed at least forty-two times. The State charged Frost with first-degree intentional homicide for A.B.'s murder, and the case proceeded to a five-day jury trial. The jury convicted Frost of first-degree intentional homicide. We now turn to the pertinent portions of the testimony at Frost's trial, from which we derive the following undisputed facts.

### The Trial

¶4 On March 31, 1993, the day before A.B.'s murder, Frost spent most of the morning and afternoon with his mother, with whom he lived. Throughout the morning and afternoon, Frost made phone calls to friends asking about party plans for the evening, including several calls to A.B. during which Frost learned that A.B. would be with friends that evening at Johnny's Bar.

¶5 Around 7:00 p.m., Frost went to the house of his friend, D.S. Two other friends, including V.L., also arrived at D.S.'s house and the group drank beer and played cards. Frost indicated to his friends that he wanted to "get laid" that night. Frost drank seven or eight cans of beer at D.S.'s house. Around 11:00 p.m., Frost joined A.B. and her friend, N.G., at Johnny's Bar, where A.B. and N.G. had been since approximately 9:00 p.m. N.G.'s boyfriend, D.D., also arrived around that time. A.B. drank a couple beers and tequila shots and Frost drank beer and several tequila shots.

¶6    Frost, N.G., and D.D. exited the bar together at around 1:30 a.m. on April 1.  The weather had turned cold and snowy.  Frost declined multiple offers by D.D. to give Frost a ride home, and Frost repeatedly told D.D. and N.G. that he was going to stay at A.B.'s house that night.  D.D. reentered the bar to retrieve A.B., who was still inside.  A.B. and D.D. lived two houses apart on Clyde Street, the same street on which Johnny's Bar was located.  A.B. decided to walk home.  Frost began walking with A.B. down Clyde Street in the direction of A.B.'s house.

¶7    It is at this point that portions of Frost's trial testimony differ from the trial testimony of some of the other witnesses who interacted with Frost during the evening before and the day of A.B.'s death.  We indicate when such a conflict exists by detailing differing testimony.

*1. Witness Trial Testimony*

¶8    D.D. and N.G. each testified that as they drove slowly away from Johnny's Bar and down Clyde Street on the morning of April 1, they observed A.B. and Frost walking down Clyde Street towards A.B.'s house.  They stopped the car and again offered A.B. and Frost a ride, which they each declined.  D.D. and N.G. continued to drive down Clyde Street, until they reached D.D.'s house and parked the car in the garage.  As D.D. and N.G. walked towards D.D.'s house, they saw Frost and A.B. walk past D.D.'s driveway, and they appeared to be having a "light argument."

¶9    D.S., whose house Frost had visited the prior evening to drink beer and play cards, testified as follows.  On April 1 between 1:30 and 2:00 a.m., D.S. called Johnny's Bar in an unsuccessful attempt to speak with Frost to ask him to bring more beer to D.S.'s house.  Around 2:30 a.m., Frost called D.S. and told him that Frost was at Country Kitchen, a restaurant across the street from Johnny's

Bar, and that he needed a ride home. D.S. declined to provide a ride. V.L., one of the other friends who had gathered at D.S.'s house to drink beer and play cards the evening prior, also testified about Frost's call to D.S.'s house on the morning of April 1. Frost sounded "[n]ervous, [a] little excited" on the phone and did not answer V.L.'s question about whether Frost was with N.G. and A.B. V.L. didn't hear any noise in the background during the call.

¶10    Around 10:30 a.m. on April 1, A.B.'s housemate returned with a friend to the house she shared with A.B. after being gone the night before. The housemate saw what she thought looked like blood on the front door of the house. When the housemate opened A.B.'s bedroom door, she saw A.B.'s naked body on the bed with her throat cut and her body covered with blood.

¶11    When the housemate's friend attempted to use the phone to call the police, the friend discovered that the phone cord that connected the phone to the wall jack was missing, rendering the phone inoperable. The housemate and friend left the premises to locate a phone to call law enforcement.

¶12    At approximately 7:00 a.m. on April 1, Frost's mother observed Frost in the house they shared lying on a couch with a blanket. Frost told her that his clothes were in the washing machine, which she could hear operating. Frost asked his mother for gauze, telling her that he had cut his hand falling down on his walk home earlier that morning but that he did not know the source of the cut.

¶13    Officers arrived at the Frost house later that day, and Frost's mother told the officers that Frost was not home. In actuality, Frost was in the house. Several hours later, Frost's mother called a friend in another town who agreed to let Frost stay overnight until he could take a bus to Florida. That night, Frost's mother transported Frost to her friend's house in the trunk of the mother's car.

¶14    Once at the friend's house, Frost asked the friend for some bandages for the cut on his hand. Frost told the friend that he had fallen the night before when he was intoxicated but did not know how he had been cut. He also asked the friend to go to Florida with him, where he planned to buy a boat and sail to the Bahamas.

¶15    The next morning, April 2, Detective Bruce Smolarek, who was the lead investigator in the case, went to the Frost house and talked with Frost's mother. Smolarek told her that A.B. had been stabbed to death. Frost's mother told Smolarek about the cut on Frost's hand and revealed his location and his plan to go to Florida. She also gave Smolarek Frost's boxer shorts, which she said she had found in the washroom and on which there appeared a "washed-out" red stain. Frost was apprehended at a Madison bus depot later that day.

¶16    After Frost was taken into custody, Detective Smolarek and Detective Tad Wetterau interviewed Frost. Smolarek testified to the following at trial about this interview. Frost said that when he was at Johnny's Bar on the evening of March 31 and morning of April 1, he drank one shot of tequila and one soft drink. Around 1:30 a.m., Frost said, he was "hanging out" in the bar parking lot with A.B., but she was acting "crazy," and he left and walked home. Frost described his walking route. He also said that at some point he fell and cut his hand on a piece of metal. Frost denied being at A.B.'s house recently or that he had ever had sexual intercourse with her. Investigators took photos of Frost's hand cut.

¶17    On April 4, after Frost had been arrested, Detective Smolarek interviewed Frost for a second time at Frost's request. Smolarek testified at trial about this second interview as follows. Smolarek summarized the questions asked

and Frost's responses in a written statement that Frost reviewed, edited, and signed.[2] In the written statement, Frost indicated that: on the afternoon of March 31, he drank a 12-pack of beer; while at D.S.'s home that evening, he drank eight cans of beer; at Johnny's Bar that evening, he drank multiple shots of tequila and several soft drinks; on two or three prior occasions, he had sexual intercourse with A.B. at her house; he never went to A.B.'s house on April 1, but he tried to call her multiple times; he thinks that he fell and cut his hand on a piece of metal or ice; blood from Frost's cut on his hand was the source of the blood stain on his boxer shorts; he washed his clothes when he got home from Johnny's Bar because he got blood on them and they got dirty when he fell; he did not know of any reason for his blood to be found in A.B.'s house; and he described a different walking route that he had taken home after leaving Johnny's Bar on the morning of April 1 than in his first interview.

¶18    N.G. testified at trial that, several days after Frost's arrest, he called her and told her that, on the night of A.B.'s murder, Frost had walked A.B. to the front door of her house, and then left to go home.

*2. Frost's Trial Testimony*

¶19    Frost testified to the following, in pertinent part, at trial. When Frost began to walk A.B. home from Johnny's Bar around 1:30 a.m. on April 1, A.B. indicated that she wanted to go back to Johnny's Bar, so Frost made plans with

---

[2] The document that Detective Smolarek drafted, summarizing the interview with Frost, is referenced in the appellate record as trial Exhibit 9, but the document itself is not included in the appellate record.

A.B. to meet her for breakfast later that morning. Frost walked for approximately one hour to his house.

¶20 To get home, Frost crossed an expressway bridge and took a shortcut through some woods. While walking through the woods, Frost tripped and fell, cutting his right hand on an unknown object. Frost estimated that he arrived at his house at around 3:00 a.m. When he arrived home, he "tried to clean [him]self up a little bit" and wrapped his cut hand in toilet paper.

¶21 Frost slept on the couch at his house and woke up around 6:30 a.m. He left the house in his mother's car and drove to A.B.'s house for their breakfast date. He drove across the same expressway bridge he had crossed the night before to get to A.B.'s house.

¶22 When Frost arrived at A.B.'s house, he knocked on the front door. When no one answered, he discovered that the door was unlocked, and he entered the house. Frost went to A.B.'s bathroom to clean his hand in the sink because his cut had begun to bleed again, and he knocked on A.B.'s closed bedroom door as he passed it. Frost walked to the kitchen to look for a wrap for his cut, passed A.B.'s closed door and again knocked on it. When he did not find a suitable wrap in the kitchen for his cut, he knocked on A.B.'s door a third time on his return to the bathroom. He wrapped his hand with toilet paper from the bathroom and opened A.B.'s bedroom door.

¶23 Frost took a few steps into A.B.'s bedroom and saw A.B.'s body lying on the bed. He took a couple more steps into the bedroom to "get a better look," leaned over her bed, and concluded that A.B. was deceased. Frost ran out of the house and got into A.B.'s car that was parked in the driveway because he

mistook A.B.'s car for his mother's car. When A.B.'s car would not start, Frost eventually drove home in his mother's car.

¶24 Frost's mother was not awake when Frost returned to their house a little before 7:00 a.m. He washed his clothes and his athletic shoes, which he had purchased one week prior, in the washing machine and lay on the couch with a blanket. Frost called D.S. around 9:00 a.m. to ask if D.S. had any gauze for Frost's cut hand. Frost called N.G. sometime later that day because he wanted to know whether anyone else besides him had discovered A.B.'s body. Frost did not tell anyone about finding A.B.'s body.

¶25 After Frost awoke later in the afternoon on April 1, his mother suggested that he go stay with her friend in another town, and he traveled there in the trunk of his mother's car. On the morning of April 2, Frost was driven by his brother from the friend's house to a Madison bus depot, from which he had planned to take a bus to Florida.

*3. Physical Trial Evidence*

¶26 The following physical evidence was presented at trial.

¶27 Shoe prints were observed on a pair of green shorts found on the floor of A.B.'s bedroom and at various locations outside of A.B.'s house. Shoe tread testing revealed that the shoe print on A.B.'s shorts matched the tread on the athletic shoes that Frost was wearing when he was taken into custody by police on April 2. Because of the snow on the ground outside of A.B.'s house, shoe prints were found on the porch outside of A.B.'s house, which made a trail to A.B.'s car in the driveway. The shoe prints on the porch were also matched to the tread on Frost's shoes.

¶28 An area resident, who lived downstream from the expressway bridge, testified that after Frost's arrest, he found a purse in a shallow river eddy at the edge of his riverfront property. Inside the purse was a wallet containing A.B.'s driver's license and her car keys. A.B.'s housemate identified the purse as belonging to A.B. and testified that A.B. did not usually carry her car keys with her because A.B.'s car was inoperable.

¶29 The housemate discovered that, in addition to the phone cord, a wash cloth and one purple cloth napkin, which had been set on the dining table the night before A.B.'s death, were missing from the house. These household items were never recovered.

### 4. Medical Trial Evidence

¶30 Dr. Robert Huntington performed the autopsy on A.B. and determined that the cut to A.B.'s throat was the cause of death and that her body was nearly empty of blood due to being stabbed repeatedly. Huntington believed that a knife or equivalent sharp object at least six inches long caused A.B.'s death.[3] Based on Huntington's examination of the cut to Frost's hand as depicted in a photograph, Huntington rejected the proposition that Frost's hand was cut by ice or a tree branch. Instead, Huntington stated that the cut appeared "as two separate areas across the palm of [his] hand with a break in the middle such as you might achieve if the hand were bent." Huntington concluded that the cut was caused by a knife, specifically one that had a serrated saw tooth edge, or an object

---

[3] The knife or sharp object used to murder A.B. was also never located. During the investigation, the housemate told Detective Smolarek that the household knife block was missing three knives, but she thought that those particular knives had all been missing before A.B.'s murder.

with an equivalent edge. Although there was no evidence of serration in the wounds on A.B.'s body, Huntington testified that it was possible to cut flesh in such a way that serrations would not be present.

¶31 A nurse who took a sample of Frost's blood after his arrest also treated his hand cut. During her trial testimony, the nurse described the cut as two linear lacerations on the palm and noted a small area of a patterned edge to the lacerations. The nurse expressed the opinion that the cut could not have been caused by a piece of metal or glass.

### 5. Forensic Trial Evidence

¶32 Blood samples were collected from A.B. and Frost, and from exterior and interior locations around A.B.'s house, including: on an exterior storm door and the front door; in the kitchen, bathroom and A.B.'s bedroom; and on the kitchen and hallway floors.[4] Inside A.B.'s bedroom, bedding soaked with blood was collected, in addition to a yellow blanket found in close proximity to A.B.'s body. Vaginal and cervical swabs and smears were also taken from A.B.'s body ("the body fluid samples"). This evidence, and the boxer shorts given to Detective Smolarek by Frost's mother, were transferred by law enforcement to the Wisconsin Crime Laboratory for forensic testing and analysis.

¶33 Pertinent to this appeal, Culhane, who as noted was a forensic scientist at the Wisconsin Crime Laboratory, conducted most of the forensic evidence testing and analysis that was requested by the State. At trial, Culhane testified as follows. As a forensic scientist in the serological section of the lab,

---

[4] Blood was also found inside A.B.'s car but these samples were not tested.

11

Culhane's responsibilities included examining physical evidence for the presence of body fluid stains, to type the body fluid stains, and to compare the results to known samples from individuals. To more specifically identify the genetic sources in the blood and body fluid samples, Culhane conducted forensic testing referred to as PGM-type testing, in which she identified an individualized genetic marker protein called phosphoglucomutase or PGM, and developed specific PGM types for Frost and for A.B. Culhane determined that A.B. was a PGM type 1-1, a type shared by approximately 40% of the general population, and that Frost is a PGM type 2-1, a type shared by approximately 20% of the general population. By developing individualized PGM types, Culhane could match a person's PGM type to the PGM type found in the blood and in the body fluid samples.

¶34 Frost's PGM type matched the blood samples collected from the following locations: on the exterior storm door and door jamb; above the front door doorknob; in two places on the kitchen floor; on the bathroom counter top, baseboard heater, and bathroom door jamb; and on A.B.'s bedroom floor. Culhane also tested "quite a few" blood stains on the yellow blanket, and determined that three of the stains were "consistent" with Frost's PGM type.

¶35 Culhane's analysis of the body fluid samples revealed a "mixed sample" containing cellular material from A.B. and the presence of semen from a second contributor.[5] Culhane was able to assign PGM Type 1-1 to the semen, and this result "was consistent with [A.B.]" When questioned about the obvious fact that the female A.B. could not be the source of the semen, Culhane responded, "I

---

[5] In her trial testimony, Culhane uses the terms "sperm" and "semen" interchangeably. For clarity and consistency purposes, we will use the term "semen" unless specifically indicated otherwise.

really can't tell you why I did not pick up a different [PGM] type [for the semen], but because of the fact that I picked up the same [PGM] type as [A.B.,] we cannot use this information to exclude or include anybody [else]." At the time, there was no testing method that allowed Culhane to separate the semen from the vaginal and cervical fluids in the body fluid samples. Culhane concluded that she could not determine whether the PGM Type 1-1 result from the body fluid samples was consistent only with A.B.'s PGM type or consistent with the PGM Type that belonged to both A.B. and the semen contributor, or that the testing did not pick up a PGM type for the semen contributor. Therefore, she could not exclude or include Frost as the source of the semen.

¶36 At the request of the prosecutor, Culhane sent certain items of evidence to the Federal Bureau of Investigation (FBI) for DNA testing, including: blood samples from Frost and A.B.; blood samples from the kitchen stove and two places from the kitchen floor, and from the floor of the hallway between the living room and kitchen; the body fluid samples; samples from Frost's boxer shorts; and the athletic shoes Frost was wearing when he was taken into custody.[6]

¶37 John Mertens, an FBI specialist in DNA testing and profiling, conducted the DNA testing of the items sent by Culhane. Mertens testified at trial as follows. Mertens was able to extract DNA from blood or body fluid stains on items at a crime scene and compare the DNA identified in those stains to a known DNA source, typically an individual. By examining and comparing the DNA from a stain sample with an individual's known DNA, Mertens was able to determine if

---

[6] DNA testing is a more "discriminating" test than the PGM testing, but DNA testing was not then in use at the state crime laboratory.

the stain DNA includes the known source, excludes the known source, or is inconclusive. An inconclusive finding was common and resulted in about twenty-five percent of samples Mertens received for DNA testing because of an insufficient quantity of DNA or a deficient quality of the DNA on the sample.

¶38 From the known blood samples taken from A.B. and Frost, Mertens developed DNA profiles for A.B. and Frost suitable for comparison to the evidence Culhane had forwarded to him for testing. The DNA profiles from blood samples on the kitchen stove and on one of Frost's shoes matched A.B.'s DNA profile. The DNA profiles from blood samples from two places on the kitchen floor matched Frost's DNA profile, with the chances of randomly selecting another individual with that same DNA profile occurring in approximately one in 200 million people. Mertens's test results from the other blood samples were inconclusive.[7]

¶39 Mertens also developed a DNA profile for the body fluid samples. He concluded that the DNA profile from the body fluid samples matched A.B. only because "the quantity of DNA that was there was insufficient for any DNA profile result to be developed beyond that of [A.B.], which is fairly common…. [T]here simply was not enough of any other DNA there to do any work with." As a result, no DNA profile was developed concerning the semen detected in the body fluid samples.

---

[7] Mertens testified that, in regard to the blood stains on Frost's boxer shorts and on the hallway floor between A.B.'s living room and kitchen, his results were inconclusive because the stain DNA was too weak to "make a positive call." On Frost's other athletic shoe, Mertens testified that no DNA profile developed at all because "the quantity was insufficient."

¶40    The jury deliberated for four hours and returned a guilty verdict of first-degree intentional homicide.

## Postconviction Proceedings

¶41    Since Frost's conviction in 1994, he has brought a direct appeal, and a postconviction motion in 2002, both of which were unsuccessful. In 2014 and 2015, Frost brought a second set of motions (the "2014 motions") for a new trial pursuant to WIS. STAT. § 974.06. In these motions, Frost argued that he is entitled to a new trial because exculpatory evidence had been suppressed and destroyed[8] and that, pursuant to WIS. STAT. § 974.07, he is entitled to additional forensic testing of the trial evidence that still existed.[9] These motions were denied by the circuit court, and Frost did not appeal.

¶42    In 2020, Frost brought a consolidated motion for reconsideration of the circuit court's denial of his 2014 motions and a third postconviction motion for a new trial pursuant to WIS. STAT. § 974.06, in pertinent part, on the following grounds: (1) newly discovered evidence in the form of averments by Dr. Robert

---

[8] Documentation from the Wisconsin Rapids Police Department indicated that in 2002, Detective Smolarek, the lead investigator in the case, had approved the destruction of all evidence, including: A.B.'s bedsheets, mattress pad, comforter, and a multicolored blanket; the sexual assault evidence kit containing A.B.'s body fluid samples; and the blood sample from A.B. Smolarek passed away in 2008. After further investigation arising from Frost's second set of WIS. STAT. § 974.06 motions filed in 2014, the following pertinent items were found and ordered by the circuit court to be kept and securely stored: A.B.'s purse and its contents; Frost's blood sample, boxer shorts, and shoes; the green shorts; the yellow blanket; crime scene photographs; and photographs of the cut to Frost's hand.

[9] Frost also argued in his 2014 motions that his conviction should be vacated because of the ineffectiveness of trial counsel and for permitting Culhane, the forensic scientist with the Wisconsin crime lab and trial witness, to be present in the courtroom for the trial testimony of Mertens, the FBI forensic analyst. These arguments were rejected by the circuit court and are not challenged in this appeal. Therefore, we do not address them further.

Reich that purport to establish that Culhane provided false trial testimony regarding the PGM-type testing results on the body fluid samples; and (2) Culhane's purported false trial testimony violated Frost's due process rights.

¶43 The circuit court granted Frost's reconsideration motion in part, to allow DNA testing on certain items of trial evidence that had been preserved, including Frost's athletic shoes; the green shorts found on A.B.'s bedroom floor; and the yellow blanket found near A.B.'s body.[10] The court also determined that an evidentiary hearing would be held on Frost's pertinent assertions in his 2020 postconviction motion.[11]

---

[10] The circuit court denied Frost's reconsideration motion and his motion to dismiss premised on the State's destruction of exculpatory evidence, determining that the claim was procedurally barred. Frost does not appeal that determination, and we do not address it further.

[11] Frost made additional assertions in his 2020 postconviction motion, including that: (1) FBI analyst Mertens provided false testimony about his DNA test results; (2) newly discovered evidence indicated that another man, related to one of A.B.'s neighbors, spent time with A.B. on the evening before and morning of her death; (3) trial counsel was ineffective for failing to obtain an expert on PGM-type testing; and (4) Frost is entitled to a new trial in the interest of justice. Although the circuit court agreed that Dr. Reich's averments that Mertens had provided false trial testimony regarding his DNA testing results and that a third-party witness averment that another man had spent time with A.B. in close proximity to her death warranted an evidentiary hearing, Frost withdrew his false testimony claims about Mertens' trial testimony after the postconviction evidentiary hearing and did not pursue the averments from the third-party witness at the postconviction evidentiary hearing. Frost's ineffective assistance of counsel claim was dismissed as being procedurally barred pursuant to *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 185, 517 N.W.2d 157 (1994) (claims of error that could have been raised on direct appeal or in previous WIS. STAT. § 974.06 motions, are barred from being raised in subsequent § 974.06 motions, absent a showing of a sufficient reason). Frost does not raise any of these issues on appeal, and we do not address them further.

*1. The Postconviction Hearing*

¶44    In November 2022, after the completion of the forensic retesting on the items of trial evidence, the circuit court held a two-day postconviction evidentiary hearing (the "evidentiary hearing").

¶45    Frost called as a witness Katrina Melichar, who was then employed as a forensic scientist in the DNA analysis unit of the Wisconsin Crime Laboratory and who conducted the forensic retesting on the items of trial evidence.  Melichar testified as follows.  She is responsible for testing biological fluids such as blood, semen, and saliva, and for developing DNA profiles that can be compared to known DNA profiles of individuals of interest.  In pertinent part, Melichar performed short tandem repeat (STR) DNA testing on items of trial evidence, including the green shorts found on the floor of A.B.'s bedroom, Frost's athletic shoes, and the yellow blanket.[12]  Melichar also obtained a buccal swab sample from Frost for comparison purposes.[13]

¶46    In contrast to the trial testimony presented by Mertens, who found that a blood stain on one of Frost's shoes matched A.B., Melichar's results were negative for blood on the shoe.  Melichar tested the green shorts for semen and blood.[14]  Two blood stains were found on the shorts.  Melichar identified the

---

[12] Melichar testified that STR DNA testing allows the identification of an individual by measuring specific, short sequences of DNA that repeat in particular ways.

[13] Although the circuit court ordered that the biological material from A.B. should be available during the retesting process for comparison purposes, Melichar did not have a blood sample or DNA profile for A.B.  The absence of these materials from A.B. is not raised on appeal, and we do not address it further.

[14] As stated, a shoe print on the green shorts had been matched to the tread on the athletic shoes Frost wore when he was arrested.  But the shorts had never been forensically tested.

17

source of one of the blood stains as a female, which she assumed was from A.B. Melichar identified Frost as the source of the second blood stain. As to the yellow blanket, Melichar identified a female source from several blood stains, which she assumed was A.B. Melichar matched two of the blood stains on the blanket to Frost. These results from the blood found on the yellow blanket were consistent with Culhane's PGM-type testing conclusions. Melichar developed a statistical probability concerning the one blood stain matched to Frost on the green shorts and the two blood stains matched to Frost on the yellow blanket, that for each match, the probability of identifying another person with this type of match was one in seven trillion, more than one thousand times the world's human population.

¶47    In her visual inspection of the yellow blanket, Melichar observed no body fluid stains besides the blood stains. However, when Melichar used an alternative light source (ALS) technique, which involves shining a specialized light, similar to a black light, on the blanket to cause bodily fluids to fluoresce and become visible on reinspection, she discovered three semen stains on one side of the yellow blanket. Melichar developed a DNA profile for two of the semen stains that excluded Frost.

¶48    Frost called witness Eric Daven, who was then a detective with the City of Wisconsin Rapids Police Department. The DNA profile Melichar obtained from the semen stains was entered into the Combined DNA Index System which is a national database of DNA profiles maintained by the FBI. A match was returned that identified J.R. as the source of the semen stains. An investigation of J.R.

ensued, and Daven testified about his two interviews with J.R.[15] In 1993, J.R. had lived in the general area where A.B. lived before her death and he had frequented Johnny's Bar. J.R. did not recognize A.B.'s name or her photo but he did recognize the house where A.B. had lived because, at some point, he had been to the house on an occasion for an after-bar party. In terms of the characterization of happenings at A.B.'s house and as captured in police reports completed during the initial investigation into A.B.'s death, Daven testified that A.B.'s house was known as a "party house," in that A.B. and her roommate hosted regular after-bar parties where drinking and sexual activities occurred.

¶49 Frost also called defense witness Dr. Karl Reich, who was then the laboratory director and the managing partner of a private DNA laboratory. Reich testified as follows. Reich's lab receives items of evidence for forensic testing, including body fluids, and performs DNA testing to obtain genetic identity information. At the time of Frost's trial, PGM-type testing was used on forensic evidence, including biological fluids, for the purpose of narrowing the pool of potential genetic sources of a particular forensic sample. PGM-type testing provided results that were insensitive or "poorly discriminating," meaning that the results should have been used only to exclude suspects, rather than to include or affirmatively identify them.[16]

---

[15] J.R. was not subpoenaed by either party to appear at the postconviction evidentiary hearing. Instead, the parties agreed to allow Detective Eric Daven to testify to the substance of his two interviews with J.R. and about occurrences at A.B.'s house before her death that were captured in prior police reports from the original police investigation.

[16] Dr. Karl Reich testified that forensic labs no longer rely on PGM-type testing, and instead use STR DNA testing, which is a more discriminating type of DNA testing. STR DNA testing renders an "unsurpassed" ability to identify a particular individual to a high degree of statistical certainty with a small amount of DNA material and can generate a reliable and reproducible DNA profile.

¶50     Dr. Reich reviewed Culhane's PGM-type testing notes, the results of the PGM-type testing she performed on the body fluid samples that resulted in only a PGM type 1-1 being identified, and her trial testimony.  Reich concluded as follows: Culhane had "mixed" body fluid samples, which contained A.B.'s genetic material and sperm cells from a male contributor; a "mixed sample should have and did provide results from both of those contributors"; and the only "viable" explanation for Culhane's PGM-type testing results was that both contributors to the body fluid samples had a PGM type of 1-1.  Reich posited that Frost, who had a PGM type 2-1, should have been excluded as a contributor to the body fluid samples.  As a result, Reich expressed the view that Culhane's trial testimony about not being able to include or exclude Frost as a contributor of the sperm in the body fluid samples was false and reflected Culhane's bias and expectation that she would find Frost's PGM Type 2-1 in the body fluid samples.  Reich also opined that Culhane should have used differential extraction, a forensic technique by which DNA is removed from inside a sperm cell and profiled, with the goal of identifying the source of the sperm.

¶51     The State called Culhane, who testified as follows.  When Culhane initially obtained the body fluid samples before the 1994 trial, she conducted a microscopic examination of the samples, which showed "mixed samples" based on the presence of cellular material from A.B., a female, and the presence of two sperm, indicating a male contributor.  The presence of two sperm indicated that the samples contained a small amount of semen.[17]  However, based on Culhane's

---

[17] Culhane testified at the evidentiary hearing that she often uses the terms "sperm" and "semen" interchangeably, but that "semen" is the fluid surrounding sperm cells.  Therefore, when she microscopically detected two sperm in the body fluid samples, she concluded that semen was also present in the fluid samples.

experience, to assign a PGM type to the semen required a larger amount of semen, and Culhane could not determine whether the PGM Type 1-1 result from the body fluid samples came from the semen, or the large amount of A.B.'s cellular material, or both, which prevented Culhane from being able to include or exclude Frost as a contributor to the body fluid samples. Culhane did not use a differential extraction method on the two sperm cells because the state crime laboratory was not using this method at the time of Culhane's testing before Frost's trial.

¶52 Culhane acknowledged at the evidentiary hearing that she had misspoken during her trial testimony when she said that she was able to assign a PGM Type 1-1 to the semen detected in the body fluid samples. But she testified that she had attempted to clarify her answer in her later trial testimony when she said that she could not determine whether the PGM Type 1-1 from the samples was solely from A.B., from both A.B. and the semen contributor due to the mixed body fluid samples, or whether the test did not detect the semen's PGM type at all given the large amount of cellular material in the sample from A.B. and the small amount of semen present. Culhane also opined at the evidentiary hearing that the limitations of PGM-type testing at the time of trial may have prevented the assignment of a PGM type for the contributor of the small amount of semen detected in the samples.

¶53 As to the yellow blanket, Culhane testified that she had been asked to analyze the blanket for blood stains, not semen. Had she been asked to analyze the blanket for semen stains, she would have performed the ALS test. Because of the limited resources and staff, Culhane conducted the specific analysis requested and did not go beyond the request.

¶54 The State also called as a witness FBI Analyst Alan Giusti, a DNA casework examiner at the Quantico FBI Laboratory. Giusti's responsibilities include analyzing evidence for the presence of blood, semen, or other body fluids that contain DNA and conducting DNA testing on identified stains. Giusti's experience in forensic analysis includes, in pertinent part, training in, using, and teaching the testing methods originally used on trial evidence, including the PGM-type testing method used by Culhane, the DNA testing method used by Mertens, and the STR DNA testing method used by Melichar. Giusti reviewed the trial transcript of Mertens' testimony, and Mertens' lab report and case documentation. Giusti testified to the accuracy of the DNA testing method used by Mertens in matching the DNA profiles from blood samples from the kitchen stove and on one of Frost's shoes to A.B.'s DNA profile, and in matching two blood samples from the kitchen floor to Frost's DNA profile. Giusti concluded that, as to matching two of the blood samples to Frost, Mertens' statistical calculation that to find another individual with the same profile would occur in 1 out of 200 million people was accurate. Further, Giusti opined that this was a "very rare random match probability."

¶55 As to the pretrial PGM-type testing performed by Culhane, Giusti testified as follows. Before DNA testing, analysts could test mixed body fluid samples that contained both sperm and vaginal cells. But the tests could not assign the results specifically to the sperm or vaginal cells. Giusti would not expect an analyst to get a PGM-type result in mixed body fluid samples from the source of a few sperm that also contained a large amount of vaginal and cervical cells. Instead, an analyst would get a PGM-type result consistent with the more numerous cells from the person who was the primary source of the sample—in

22

this case, A.B. Therefore, Culhane's trial testimony that she could not exclude Frost from the PGM-type testing results was accurate.

¶56 After the evidentiary hearing, Frost filed a supplemental WIS. STAT. § 974.06 motion arguing that he is entitled to a new trial because of the newly discovered exculpatory semen evidence and an alleged due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963), due to the State's failure to disclose the semen evidence, and in the interest of justice.

### 2. *The Circuit Court Postconviction Decision*

¶57 After additional post-hearing briefing by the parties, the circuit court issued an oral ruling in June 2023 denying Frost's claims that he is entitled to a new trial on grounds of newly discovered evidence, due process violations, and in the interest of justice.[18]

¶58 Frost appeals, arguing that the circuit court erred and that he is entitled to a new trial on the four grounds rejected by the circuit court, and in the interest of justice.

¶59 We reference additional facts and procedural history as needed.

### DISCUSSION

¶60 As stated, Frost argues that the circuit court erred in denying his postconviction motions for a new trial on the following grounds: the newly

---

[18] The parties stipulated in the postconviction proceedings before the circuit court, and the court determined, that the court lacked authority to grant Frost a new trial in the interest of justice pursuant to WIS. STAT. § 974.06, thus preserving the issue for appeal. We address the interest of justice claim in the text.

23

discovered evidence concerning Culhane's purported false testimony and the exculpatory semen evidence; and due process violations pursuant to **Brady** resulting from the State's failure to disclose the exculpatory semen evidence and pursuant to **Napue v. Illinois**, 360 U.S. 264 (1959), resulting from Culhane's purported false trial testimony. In the alternative, Frost argues that he is entitled to a new trial in the interest of justice. We address, and explain why we reject, these arguments in turn.

### I. Newly Discovered Evidence

¶61    Frost argues that Culhane's purported false trial testimony and the exculpatory semen evidence matched to J.R. constitute newly discovered evidence entitling him to a new trial because the new evidence creates a reasonable probability of a different trial outcome.

### Standard of Review

¶62    As indicated, at issue here is Frost's third set of motions for a new trial pursuant to WIS. STAT. § 974.06. Newly discovered evidence may be a sufficient reason for failing to raise, or for inadequately raising, an issue previously. **State v. Edmunds**, 2008 WI App 33, ¶9, 308 Wis. 2d 374, 746 N.W.2d 590. Appellate courts review a circuit court's decision to grant or deny a newly discovered evidence motion for an erroneous exercise of discretion. **State v. Plude**, 2008 WI 58, ¶31, 310 Wis. 2d 28, 750 N.W.2d 42. We will sustain a circuit court's decision to grant or deny a new trial if the court "examined the relevant facts; applied a proper standard of law; and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach." **State v. Sullivan**, 216 Wis. 2d 768, 780-81, 576 N.W.2d 30 (1998).

¶63     To succeed on a motion for a new trial based on newly discovered evidence, the evidence must sufficiently establish that a defendant's conviction resulted in a "manifest injustice." *State v. Avery*, 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60 (citation omitted).  To show a manifest injustice, the defendant must first prove by clear and convincing evidence that: (1) the new evidence was discovered after conviction; (2) the defendant was not negligent in seeking the new evidence; (3) the new evidence is material to an issue in the case; and (4) the new evidence is not merely cumulative.  *Id.*  We refer to these four initial factors as the "threshold factors."

¶64     If the circuit court determines that the threshold factors have been met, it then "must determine whether a reasonable probability exists that a different result would be reached in a trial." *Id.* (citation omitted).  A reasonable probability of a different trial outcome exists if "a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt." *Id.* In making this inquiry, a court should consider "whether a jury would find that the newly-discovered evidence had a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt as to the defendant's guilt." *Plude*, 310 Wis. 2d 28, ¶33.

¶65     Frost argues that the determination of whether introduction of the newly discovered evidence at a new trial would have a reasonable probability of a different trial outcome is an issue of law that we determine independently.  The State does not discuss the standard of review asserted by Frost, and therefore the State concedes the issue. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 108-09, 279 N.W.2d 493 (Ct. App. 1979) ("Respondents on appeal cannot complain if propositions of appellants are taken as confessed which they do not undertake to refute." (citation omitted)).  Accordingly, we

independently review whether there is a reasonable probability that a jury, when considering both the old evidence and the new evidence, would have a reasonable doubt about Frost's guilt.

## A. Culhane's Testimony

¶66    Frost argues that newly discovered evidence in the form of Dr. Reich's testimony about Culhane's purported false trial testimony entitles Frost to a new trial. As we explain, we conclude that the circuit court did not clearly err in finding that Reich's opinion that Culhane's trial testimony was false is not sufficiently supported by the evidence. Specifically, there is evidence to support the court's finding that Reich failed to support his assumption that there was enough semen present in the body fluid samples to produce a PGM type for the semen contributor.

¶67    Belated discovery that a state's expert provided false testimony at trial on key issues may satisfy the newly discovered evidence criteria. **Plude**, 310 Wis. 2d 28, ¶¶34, 49.[19]  Dr. Reich averred in affidavits supporting Frost's 2020 newly discovered evidence motion, and opined during the evidentiary hearing, that Culhane's trial testimony was false because Culhane should have testified that

---

[19] The State argues in the alternative that, because Culhane's PGM-type testing results and her conclusions were available to Frost before trial, Dr. Reich's opinion about these issues does not satisfy the "discovered after conviction" threshold requirement for newly discovered evidence. *See State v. Fosnow*, 2001 WI App 2, ¶¶9, 25, 240 Wis. 2d 699, 624 N.W.2d 883 (2000) ("Newly discovered evidence, however, does not include the 'new appreciation of the importance of evidence previously known but not used.'" (citation omitted)). Because our conclusion that the circuit court did not clearly err in rejecting Reich's opinion that Culhane's testimony was false is dispositive on this issue, we do not address the State's alternative argument. *See Lamar Cent. Outdoor, LLC v. DHA*, 2019 WI 109, ¶41, 389 Wis. 2d 486, 936 N.W.2d 573 ("An appellate court need not address every issue raised by the parties when one issue is dispositive." (citation omitted)).

Frost was excluded as the contributor of the semen in the body fluid samples given that the PGM type 1-1 result from the samples differed from Frost's PGM type 2-1. Reich opined that Culhane had testified falsely that she could not include or exclude Frost as a contributor to the body fluid samples. However, Reich also conceded during his testimony at the evidentiary hearing that: there was no way for Culhane to know or determine the ratio of vaginal fluid to semen in the body fluid samples; Reich assumed "that there was enough semen for the PGM test to give [Culhane] the expected results"; to render a PGM-type result from a body fluid sample, there needs to be a large sample; and "we don't know whether there was so much female [body fluid] and not enough male [body fluid] to [detect] in the PGM."

¶68     The circuit court recognized that Culhane made an initial mistake in her trial testimony when she said that she was able to obtain a PGM type 1-1 for the semen in the fluid samples. At the same time, the court noted that Culhane clarified her answer later in her trial testimony when she said repeatedly that she could not affirmatively exclude or include Frost as the source of the semen in the body fluid samples because she could not determine if the PGM type detected was only from A.B., from A.B. and the contributor of the semen, or whether the PGM-type testing did not pick up the semen at all. The court also found that: Culhane's trial testimony was consistent with the evidentiary hearing testimony of Culhane and Giusti when they each addressed their extensive experience conducting PGM-type testing; the PGM-type testing method used pretrial was not discriminatory and was relatively weak in its ability to identify a PGM type for small amounts of semen in the fluid samples; differential extraction was not available at the time of the PGM-type testing to separate the female from the male biological material; and

the likely probability was that the PGM-type testing result was exclusively from A.B.'s biological material, given the little amount of sperm present.

¶69 From this testimony, the circuit court concluded that the assumption Dr. Reich made—that there was enough semen in the body fluid samples to render a PGM type and affirmatively exclude Frost, contrary to Culhane's trial testimony—is not factually supported by the evidence. Frost does not argue on appeal that the court's finding is clearly erroneous. We apply a highly deferential standard of review to a circuit court's findings of fact and will defer to the court's findings unless they are "against the great weight and clear preponderance of the evidence." ***Royster-Clark, Inc., v. Olsen's Mill, Inc.***, 2006 WI 46, ¶12, 290 Wis. 2d 264, 714 N.W.2d 530.

¶70 Instead of challenging the circuit court's factual findings regarding Dr. Reich's testimony, Frost relies on ***Plude*** to support his argument that he met the four threshold factors necessary for his newly discovered evidence claim. Such reliance is misplaced here. In ***Plude***, following a jury trial during which the cause of the victim's death was the central dispute and the medical expert opinions regarding the issue varied, the defendant was convicted for the first-degree murder of his wife. ***Plude***, 310 Wis. 2d 28. Postconviction, it was discovered that one of the State's experts in "injury mechanism analysis" had lied about his credentials under oath, which the State conceded. ***Id.***, ¶¶24, 34. As a result, there was no dispute that the defendant, in identifying the false credentials of the State's expert witness, had clearly and convincingly satisfied each of the four threshold factors for newly discovered evidence.

¶71 There is no such concession here. In contrast, the circuit court did not consider the four threshold factors in rejecting Frost's newly discovered

evidence claim concerning Culhane's PGM trial testimony because the court concluded that the fundamental premise of the claim—that there was enough semen in the body fluid samples to conclusively exclude Frost as the contributor—is insufficiently supported by the evidence. Moreover, as the court determined, this case differs from the other cases Frost cites concerning when scientific advances legitimately call into question the scientific foundation for expert testimony at trial that was material to a defendant's conviction. *See Edmunds*, 308 Wis. 2d 374, ¶¶1-3 (developments in medical research and literature on shaken baby syndrome constituted newly discovered evidence entitling defendant to a new trial). Dr. Reich's testimony focused on Culhane's interpretation of her PGM testing, the PGM testing results, and its limitations, but it did not otherwise undermine the validity of PGM-type testing. For these reasons, we reject Frost's newly discovered evidence claim concerning Culhane's trial testimony.

### B. The Semen Evidence

¶72 As noted, the circuit court determined that Frost "rather easily satisfied" each of the four threshold factors concerning the newly discovered semen evidence. We assume without deciding that the court properly exercised its discretion in finding that Frost made the threshold showing with clear and convincing evidence. *Avery*, 345 Wis. 2d 407, ¶¶23, 25.

¶73 This brings us to the issue of whether the semen evidence presented a reasonable probability of a different trial outcome. In other words, we make an independent determination as to whether there is a reasonable probability that a jury, looking at both the "old" trial evidence and the new evidence, would have a reasonable doubt as to Frost's guilt. *Plude*, 310 Wis. 2d 28, ¶32.

¶74    In making this determination, we consider "whether a jury would find that the newly-discovered evidence had a sufficient impact on other evidence presented at trial such that a jury would have a reasonable doubt as to the defendant's guilt." *Id.*, ¶33 (citation omitted). We conclude, as the circuit court concluded, that the semen evidence would not have sufficiently exculpatory effects on the other evidence presented at trial as to create a reasonable doubt about Frost's guilt.

¶75    The circuit court concluded that, with the exception of Dr. Reich's opinion about a portion of Culhane's trial testimony that we have already addressed, the newly discovered semen evidence would not undermine significantly inculpatory evidence that was presented at trial. Specifically, the court reasoned that the semen evidence would not have lessened the effect on the jury of any of the following evidence: Frost's testimony about walking home from Johnny's Bar on the morning of April 1 and cutting his hand; Frost's testimony about him returning to A.B.'s house the next morning and discovering her body; Frost's inconsistent statements to law enforcement, including his initial denial of previous sexual encounters with A.B.; statements that Frost made to other trial witnesses about Frost's desire to have sex that night and his intention to stay at A.B.'s house the morning of the murder; and that Frost was seen by multiple trial witnesses walking with A.B. towards her house and in close proximity to her house after leaving Johnny's Bar. Further, the semen evidence would not have undermined the inculpatory effects of: the discovery of A.B.'s naked body with dozens of stab wounds, including to the vaginal area; the blood and body fluid samples; the autopsy findings regarding A.B.'s manner of death and the medical testimony that the cut to Frost's hand was caused by a knife or an object with an equivalent edge; the DNA evidence identifying Frost as the source of numerous

blood samples found in A.B.'s house; and the evidence of consciousness of guilt when Frost fled in the trunk of his mother's car on the day of the crime.

¶76     The circuit court concluded that, when comparing the semen evidence with the "old" trial evidence, a jury would not have a reasonable doubt about Frost's guilt.  Although J.R. was identified as the source of the semen evidence, and J.R. acknowledged living in the general area where the murder occurred, frequenting Johnny's Bar, and going to the house where A.B. lived for an after-bar party at some point, there was no way to determine the general age of the semen stain, including precisely when or how it came to be on the yellow blanket.  Further, there was also no other evidence that linked J.R. to the crime.[20] For example, there was no evidence that, around the time of A.B.'s murder, J.R. had been in communication with A.B. or had been present at Johnny's Bar or A.B.'s house.

¶77     Moreover, the circuit court also determined that some of the new evidence strengthened the State's case.  For example, new forensic testing of the green shorts found on A.B.'s bedroom floor identified Frost as the source of one of the two blood stains on the shorts that Melichar analyzed.  The forensic retesting of the blood stains on the yellow blanket with a more precise DNA test confirmed that Frost was the source of the blood stains with even stronger certainty—instead of 1 in 200 million people being a genetic match as testified to at trial by Mertens,

---

[20] The State argues in the alternative that the newly discovered semen evidence from the yellow blanket would have to be analyzed under *Denny* in order to be admissible at trial.  *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984).  Because we dispositively conclude that the semen evidence does not create a reasonable probability of a different outcome at a new trial, we do not address the admissibility issues raised by the State under *Denny*.  *See Lamar Cent. Outdoor, LLC*, 389 Wis. 2d 486, ¶41 ("An appellate court need not address every issue raised by the parties when one issue is dispositive." (citation omitted)).

the new range was 1 in 7 trillion being a genetic match as testified to by Melichar at the evidentiary hearing. As noted, Culhane's and Giusti's evidentiary hearing testimony about the limited amount of semen in the body fluid samples provided an even stronger explanation in support of Culhane's trial testimony that Frost could not be excluded as a contributor to the semen.

¶78 Our independent review of the issue results in the same conclusion as the circuit court. In addition to the court's conclusions, we make the following determinations which support that the semen evidence does not result in a substantial probability of a different trial outcome.

¶79 The semen evidence does not undermine various admissions by Frost, including that: he began to walk A.B. home from Johnny's Bar on the morning of her murder; he was in A.B.'s house the morning of her murder and again bleeding from a cut on his hand; Frost stated that he assumed the blood discovered throughout A.B.'s house was his blood; any smeared blood in A.B.'s house was from his footsteps in fleeing A.B.'s house and not having time to clean up the blood; he had possession of A.B.'s car keys, entered A.B.'s vehicle, and attempted to start it (by his account, because he had mistaken it for his mother's car); he had to cross the expressway bridge to get to and from A.B.'s house from his own house, under which A.B.'s purse with her car keys inside had been found; he did not tell anyone about finding A.B.'s body (by his account, only because he did not want to be suspected of killing her); he called N.G. the day of A.B.'s death to ascertain whether A.B.'s body had been discovered; and he intentionally did not ask N.G. about A.B. during the call because he did not want to raise suspicion that he knew of A.B.'s death before her body was discovered.

¶80    The semen evidence also did not undermine the inculpatory effect of Frost's statements to Detective Smolarek during two interviews as follows: blood from the cut to Frost's hand was on the boxer shorts that he was wearing on the morning of A.B.'s death that his mother gave to Smolarek; Frost washed his clothes when he got home from Johnny's Bar, according to him because he "got blood on them, and when [Frost] fell they got dirty"; and Frost washed his athletic shoes when he got home from Johnny's Bar, even though the shoes had just been purchased one week prior.

¶81    The semen evidence does not diminish Frost's substantial credibility issues as underscored by the testimony of several law enforcement officers about Frost's inconsistent statements regarding: the amount of alcohol Frost consumed on the day before and on the morning of A.B.'s death; Frost's walking route home from Johnny's Bar on the morning of April 1; what object Frost cut his hand on, which he identified at different times as a piece of metal, ice, a branch, or an unknown object; and whether his blood would be found in A.B.'s house, which he initially denied but eventually admitted.

¶82    The semen evidence also does not resolve the conflicts between Frost's trial testimony and the trial testimony of the other witnesses, further undermining Frost's credibility. For example, D.D. and N.G. testified that they observed Frost walk A.B. from Johnny's Bar towards A.B.'s house, and that they observed the pair pass D.D.'s house, which, as noted, was located two houses away from A.B.'s house. In contrast, Frost testified that he left A.B. about ten feet outside of the parking lot of Johnny's Bar. N.G. also testified that, during a call from Frost from jail several days after his arrest, Frost told N.G. that he had walked A.B. to her front door. During his trial testimony, Frost denied making this statement. D.S. and V.L. testified that at around 2:30 on the morning of

A.B.'s murder, Frost called D.S. and V.L., alleging that he was at the Country Kitchen restaurant and requesting a ride home. Frost denied making this call.

¶83 In addition to Frost's admissions, his inconsistent statements, and contrary witness trial testimony, the semen evidence does not diminish the strength of the DNA blood evidence linking Frost to the crime, in which Frost was identified as the source of two blood stains on the kitchen floor to such a degree that only 1 in 200 million people would have matched the DNA profile from the stains. Blood samples on the interior of A.B.'s house placed Frost at the crime scene on the morning of A.B.'s death. Culhane's PGM-type testing included Frost as the source of the blood that was found on the house's exterior storm door, interior door jamb, and above the doorknob; in two places on the kitchen floor; on the bathroom counter top, baseboard heater, and door jamb; and on the floor in A.B.'s bedroom; and his blood was matched to three blood stains on the yellow blanket. A.B.'s blood was matched to blood stains in three places: on the kitchen stove, the yellow blanket, and on one of Frost's shoes.

¶84 The semen evidence does not undermine the inculpatory effect of the shoe print evidence discovered on the front porch of A.B.'s house and in her bedroom, which matched the treads on the athletic shoes Frost was wearing when he was arrested. Although Frost's shoe treads were only matched to the shoe prints on the front porch, a shoe print trail was identified traveling from the front door to A.B.'s inoperable vehicle in the driveway, which Frost admitted to attempting to start. An additional trail with shoe tread impressions destroyed by blowing snow was identified that traveled from A.B.'s house down Clyde Street, the path that Frost would have taken had he walked home from A.B.'s house.

¶85 Although the semen evidence in itself could count as exculpatory as to Frost, and could raise a question regarding the identity of the perpetrator, when compared to the entirety of the trial evidence and the other newly discovered evidence that strengthens Frost's ties to the crime, we conclude that the newly discovered evidence does not create a reasonable probability that a jury would have a reasonable doubt about Frost's guilt.

¶86 Frost argues that the semen evidence creates a strong likelihood that the factfinder would find reasonable doubt of Frost's guilt because the issue at trial was the identification of the perpetrator, and the semen evidence identifies an alternative suspect, J.R., as the murderer. But the semen evidence is limited evidence tying J.R. to the crime and we are not persuaded that the semen evidence, or J.R. as the source, would create a reasonable doubt about Frost's guilt.

¶87 Further, the discovery of J.R.'s semen on the yellow blanket is consistent with trial evidence introduced by both parties that A.B. hosted parties and was socializing with many men who stayed the night at her house in the weeks before her death. In fact, the defense presented trial testimony from six men who all testified that they were friendly with A.B. and that each had stayed the night at her house on at least one occasion in close proximity to her death.

¶88 Frost also argues that the semen evidence is material because the State's case against Frost was entirely circumstantial. We reject this argument because circumstantial evidence can be as powerful as direct evidence in establishing guilt beyond a reasonable doubt, and it can be sufficient. *State ex rel. Hussong v. State*, 62 Wis. 2d 577, 215 N.W.2d 390 (1974); *see also* WIS JI—CRIMINAL 170 Circumstantial Evidence ("Circumstantial evidence is not

necessarily better or worse than direct evidence. Either type of evidence can prove a fact.").

¶89    Frost also argues that his trial testimony provides a "plausible explanation" for much of the physical evidence that implicates him in the crime. For example, Frost contends that his footprints outside of A.B.'s house were made when he arrived there on the morning of April 1 to have breakfast with A.B. Yet, when questioned about Frost's arrival at A.B.'s house at approximately 6:30 a.m. on April 1, Frost could not recall where he parked his mother's car, which he had allegedly driven to get there, or how he came to possess A.B.'s car keys in his attempt to start A.B.'s car instead of his mother's car after he discovered A.B.'s body and fled the scene. Frost asserts that the presence of his blood on the exterior and interior of A.B.'s house is explained by his trial testimony that, when he arrived to pick A.B. up for breakfast, the cut to his hand began to re-bleed. However, another plausible explanation for the presence of Frost's blood outside of and in A.B.'s house was that he had cut his hand while stabbing A.B. with a knife. And again, Frost gave inconsistent statements about how he cut his hand. In contrast, Dr. Huntington testified unequivocally that the cut on Frost's hand was caused by a knife or an equivalent sharp object. Frost testified at trial that he must have "smudged" blood with his shoes when he hurriedly left A.B.'s house. An expert testified that the "smudged" blood resembled an attempt to clean up the blood, rather than a smudge from the ordinary motion of a shoe when the wearer walks or runs.

¶90    It is within the province of the jury to weigh the credibility of trial witnesses, and the jury rejected Frost's testimony on these matters. Indeed, jurors are "the sole judges of the credibility, that is, the believability, of the witnesses and of the weight to be given to their testimony." WIS JI—CRIMINAL 300

Credibility of Witnesses. The jury was not obligated to accept Frost's version of events, and we cannot second guess the jury's assessment of credibility and the weight it gave to the trial evidence.

¶91    Frost asserts that, like the semen evidence, there is no precise way to identify when the blood evidence was deposited in A.B.'s house. We reject this argument because the jury could have reasonably credited Frost's admission that he was the source of the blood found throughout A.B.'s house. Further, the testimony of A.B.'s housemate significantly narrowed the timeframe during which Frost's blood could have been deposited in and around A.B.'s house. The housemate testified that she had cleaned the house on March 31 and did not notice any substances in the house that appeared to be blood. The housemate left the house that evening around 9:30 p.m. When the housemate returned to the house around 10:30 the next morning, she noticed what looked like blood on the exterior door to the house. When the housemate opened the door to A.B.'s bedroom, she discovered A.B.'s naked body covered in blood.

¶92    In contrast, the semen evidence was not visible to the naked eye and could not be detected without the ALS technique that Melichar used. Melichar's postconviction hearing testimony indicated that there was no way to determine a date, or a range of dates, on which the semen came in contact with the yellow blanket.

¶93    In sum on this issue, we conclude that the semen evidence did not substantially diminish the volume or strength of the trial evidence supporting Frost's conviction, such that a comparison between the old trial evidence with the newly discovered evidence created a reasonable probability of a different trial outcome.

## II. Due Process Violations Under *Brady* and *Napue*

¶94     Frost argues that he is entitled to a new trial because of due process violations under *Brady*, 373 U.S. 83, and *Napue*, 360 U.S. 264. For the following reasons, we reject both arguments.

### A. The *Brady* due process claim

¶95     A defendant has a due process right to any favorable evidence "material either to guilt or to punishment" that is in the State's possession. *Brady*, 373 U.S. at 87. To establish a *Brady* violation, a defendant must show three components: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material." *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468. (citing *State v. Harris*, 2004 WI 64, ¶15, 272 Wis. 2d 80, 680 N.W.2d 737). Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Harris*, 272 Wis. 2d 80, ¶14 (citation omitted). We independently review whether a *Brady* violation occurred, but accept the circuit court's factual findings for such a determination unless those findings are clearly erroneous, *Wayerski*, 385 Wis. 2d 344, ¶35, or "against the great weight and clear preponderance of the evidence," *Royster-Clark, Inc.*, 290 Wis. 2d 264, ¶12.

¶96     For the purposes of our analysis, we assume without deciding that the semen evidence was both exculpatory and inadvertently suppressed. However, Frost fails to demonstrate that the semen evidence was material. In support of his assertion of the materiality of the semen evidence, Frost advances the same

arguments as those advanced in support of his newly discovered evidence claim. We have already considered and rejected these arguments in determining that, when compared with the scope and strength of the trial evidence and the new inculpatory evidence, the semen evidence does not create a reasonable probability of a different trial outcome. We reject Frost's **Brady** claim for the same reasons and conclude that Frost has not demonstrated that the semen evidence, had it been disclosed, would have resulted in a reasonable probability of a different trial outcome. *Wayerski*, 385 Wis. 2d 344, ¶61. We need not repeat all that discussion here.

### B. The *Napue* due process claim

¶97 We dispose of Frost's **Napue** due process argument on a similar basis. Frost argues that he is entitled to a new trial because his due process rights were violated under *Napue*, 360 U.S. 264, by Culhane's purported false trial testimony regarding her PGM-type testing results from the body fluid samples. A due process violation under **Napue** occurs when the state presents false testimony and that testimony had a reasonable likelihood to have affected the judgment of the jury. *Id.* at 269.

¶98 Like Frost's newly discovered evidence claim regarding Culhane's purported false trial testimony, the circuit court denied Frost's **Napue** due process claim on the merits, finding that Culhane's mistaken trial testimony on one point did not render her testimony that Frost could not be excluded from the PGM-type testing results from the body fluids materially false. As we have explained, the court rejected Frost's claim on this issue, in part, because Dr. Reich's testimony that supported this claim contained an assumption that was not supported by the evidence—namely, that there was enough semen present in the body fluid samples

39

to render a PGM type for the semen. Frost fails to advance any argument on appeal that this finding was clearly erroneous.

¶99    The circuit court also found that during her trial testimony, Culhane "made a mistake in the one statement" about the semen in the body fluid samples being assigned a PGM 1-1 type. However, the court determined that Culhane clarified her answer in her subsequent trial testimony that no PGM type could be assigned to the semen. Further, the court found that both Culhane's and Giusti's hearing testimony reinforced Culhane's trial conclusion that the PGM type from the body fluid samples could not be used to exclude Frost as the source. For these reasons, we reject Frost's claim that his due process rights were violated pursuant to *Napue*.[21]

### III.  Interest of Justice

¶100   Frost argues that he is entitled to a new trial in the interest of justice because the real controversy was not fully tried. *See* WIS. STAT. § 752.35 ("In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, … the court may reverse the judgment or order appealed from[.]"); *see also* **State v. Kucharski**, 2015 WI 64, ¶41, 363 Wis. 2d 658, 866 N.W.2d 697 ("reversals under WIS. STAT. § 752.35 are rare and reserved for exceptional cases"). Specifically, Frost argues that because the jury

---

[21] The State argues in the alternative that Frost's *Napue* due process claim is procedurally barred by WIS. STAT. § 974.06 and *Escalona* because Frost does not explain why he was unable to challenge Culhane's trial testimony about the PGM-type testing results in his first appeal, or in his two prior § 974.06 motions in 2002, or his second set of § 974.06 motions in 2014. Because our conclusion that Frost has not demonstrated that the circuit court erred in its factual findings that Culhane's trial testimony was not materially false is dispositive on this issue, we do not address the State's alternative procedural argument.

did not hear testimony about the semen evidence, which bore on the central issue at trial—the identity of the perpetrator—this issue was not fully tried. Frost contends that the semen evidence, combined with the purported newly discovered evidence in the form of Dr. Reich's opinion that Culhane's trial testimony was false, make this the exceptional case in which the real controversy has not been fully tried. We reject this argument for the following three reasons.

¶101 First, as discussed, the circuit court found that Dr. Reich's opinion that Culhane's trial testimony was false, because she did not testify that Frost was excluded from the body fluid samples, was not supported by sufficient evidence.

¶102 Second, we reject Frost's assertion that the semen evidence discredits the State's arguments regarding pivotal evidence, which Frost alleges is the blood stains found on the yellow blanket that matched to Frost. Frost does not present a persuasive argument that the semen evidence undermined the blood evidence on the yellow blanket, and additionally ignores the wealth of other evidence that linked Frost to the crime, as we have extensively discussed above.

¶103 Frost likens the discovery of the semen evidence here to the newly discovered evidence in *State v. Hicks*, 202 Wis. 2d 150, 549 N.W.2d 435 (1996), and *State v. Armstrong*, 2005 WI 119, 283 Wis. 2d 639, 700 N.W.2d 98. In those cases, postconviction DNA testing excluded each defendant as the source of critical pieces of physical evidence relied on by the State to obtain the convictions.

¶104 In *Hicks*, the defendant was convicted of two counts of sexual assault. Forensic testing of blood, semen, and saliva revealed inconclusive results. *Hicks*, 202 Wis. 2d at 155. Several pubic hairs were recovered from the victim's apartment which were not submitted for DNA analysis prior to trial, but a state crime analyst testified that the hairs were microscopically examined and consistent

with samples provided by the defendant, which the State relied upon as affirmative evidence of the defendant's guilt. *Id.* at 158-59. Postconviction, DNA testing revealed that the defendant was excluded as the source for at least one of the pubic hairs. *Id.* at 156. Our supreme court affirmed the court of appeals in ordering a new trial in the interest of justice, concluding that the issue of identification was not fully tried because the jury did not hear the DNA evidence excluding the defendant as the source for one of the pubic hairs, reasoning that the State had "assertively and repetitively" used the pubic hair evidence to secure the defendant's conviction. *Id.* at 172.

¶105 In *Armstrong*, the defendant was convicted of first-degree sexual assault and first-degree murder of the same victim. *Armstrong*, 283 Wis. 2d 639. At trial, the State's expert testified about a bathrobe belt draped over the victim's body on which one head hair "consistent" with the defendant's head hair and one head hair that was "similar" to the defendant's head hair were discovered. *Id.*, ¶80. Another state expert testified that semen stains found on the victim's bathrobe were consistent with the blood type of the defendant and the blood type of the victim's boyfriend, which matched approximately 80% of the world's population. *Id.*, ¶¶65-67. Postconviction DNA testing excluded the defendant as the source of the two head hairs on the bathrobe belt and the semen stains on the bathrobe. *Id.*, ¶¶95, 155. In ordering a new trial in the interest of justice, our supreme court concluded that because the State used the physical evidence "assertively and repetitively as affirmative proof of [the defendant's] guilt," the real controversy—the identity of the perpetrator—was not fully tried. *Id.*, ¶156.

¶106 Frost's reliance on *Hicks* and *Armstrong* in support of his assertion that he is entitled to a new trial in the interest of justice is misplaced. Both of these cases are factually distinguishable from the case here and serve to reinforce

our conclusion that this is not an exceptional case where the controversy was not fully tried. In *Hicks* and *Armstrong*, the determinative factor that merited a new trial was the State's assertive and repetitious use of critical physical evidence that, when DNA tested following the trial, excluded the defendant as the source. *Hicks*, 202 Wis. 2d at 172; *Armstrong*, 283 Wis. 2d 639, ¶156. Our Supreme Court considered both cases to constitute exceptional cases requiring reversal due to the new results of the DNA testing fundamentally undermining the core evidence in each respective case. *Hicks*, 202 Wis. 2d at 172; *Armstrong*, 283 Wis. 2d 639, ¶114.

¶107 In contrast to *Hicks* and *Armstrong*, the semen evidence here does not significantly undermine the "pivotal" pieces of evidence presented by the State during Frost's trial. For example, the semen evidence does not undermine the strength of the forensic blood evidence, found on the yellow blanket and throughout A.B.'s house, that strongly matched Frost as the blood source. In other words, there is nothing about the semen evidence that serves to undermine the forensic blood testing that matched Frost as the source. Moreover, as detailed, there was a wealth of other evidence that linked Frost to the crime. As a result, the semen evidence does not elevate this case to the "exceptional" category in the same manner as the new forensic testing did in *Hicks* or *Armstrong*.

¶108 Third, we reject Frost's assertion that he is entitled to a new trial in the interest of justice because the semen evidence calls into question the State's trial theory that A.B.'s murder was sexually motivated. The foundation for this argument rests on a weak premise—that the semen evidence undermines the other evidence supporting the State's theory that a sexual motive may have driven the chain of events that lead to A.B.'s murder. The semen evidence does not undermine Frost's own statements indicating he wanted to have sex that night, that

he was spending the night at A.B.'s house, and his eventual admission that on past occasions, he had had sexual intercourse with A.B. The State's theory of the case remains plausible. Therefore, Frost's claim is not a sufficient basis to meet the exceptional standard of awarding a new trial in the interest of justice.

¶109 In sum on this issue, we reject Frost's request for a new trial in the interest of justice.

## CONCLUSION

¶110 For all of the reasons stated above, we affirm the circuit court's decision denying Frost's postconviction motions for a new trial.

*By the Court.—*Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.